WILLIAMS, J.
| ;This matter involves four young children who were placed in the custody of the Louisiana Department of Children and Family Services (“DCFS”) over 2 1/2. The juvenile court entered a judgment changing the goal of the permanent case plan from reunification with the parents to adoption. The mother has appealed that ruling. For the following reasons, we affirm.
FACTS
A.F. (“the mother”) is the 28-year-old mother of five children: A.F., born February 5, 2005; K.F., born May 21, 2007; P.F., bom August 7, 2008; and twins, C.F. and C.F., bom June 25, 2009. H.T. (“the father”) is the biological father of the five children.
At some point, the mother went to Texas, where she remained for an extended period of time. On November 18, 2013, DCFS received a report of physical abuse against one of the twins. The report stated that the four-year-old boy had a large bruise on his buttocks and a bruise on his side “in the shape of a belt.”
A DCFS investigation revealed that the mother had left the five children in the care of Marquerite Odom, an acquaintance who has been described as having “comprehension issues” and being “developmentally delayed.”[1] The DCFS investigator also learned that Odom and her brother, |2Robert Frost, had been physically abusing all of the children.[2]
The DCFS investigator interviewed Frost. He stated that he had been living in the home with Odom, his mother (Sandra Summerall) and the children for ap *747 proximately two years. Frost admitted that he often “spanked” the children with a wooden back scratcher “to teach them some discipline,” but he denied being aware that the wooden object had left bruises or marks on the children. Further, Frost admitted that he had spanked the children the previous night, because they had “trashed the living room” and had disobeyed Odom when she told them to go to bed.
The investigator also interviewed Sandra Summerall, the mother of Odom and Frost. Summerall stated that Odom and Frost would often spank the children and that she was “sorry that the situation had got[ten] this far out of hand.” Summerall admitted that she never attempted to protect the | ¡.children from the abuse, stating that she would go into another room when the spankings would occur. Further, Summerall described Frost as having “major anger issues” and Odom as having “comprehension issues and developmental delays that cause[d] her to be short-tempered with the children.” Summerall further admitted that she had spanked the children in the past, but stated that, she had “never left any bruises.” She stated, however, that Odom and Frost would “spank the kids really hard, and they ha[d] left marks and bruises on the kids.”[3]
Additionally, the DCFS investigator interviewed Odom. She stated that the children had been left in her care for approximately four years and she had not received any assistance from the children’s parents or grandparents. Odom also stated that the mother had last visited the children “around Easter” of 2013. She admitted that she was aware that Frost had spanked the children the previous day because she “heard them crying.” According to Odom, she told Frost, “That’s enough.” However, he “cursed her out” and contin-uéd to hit the children.[4]
The DCFS investigation also revealed that Odom and :her family lived in a two-bedroom home. Odom, Summerall and the five children shared one bedroom; Frost occupied the other bedroom.[5] According to the DCFS investigator, the conditions of the home were deplorable: trash, feces and | ¿piles of clothing, littered the floors throughout the house. Additionally, the investigator noted that “unclean dishes” were around the house, and the kitchen contained “spoiled food in the sink and on the counter tops and several pots on the stove with molded sour food on it.”
Initially, the DCFS worker assigned to the case was unable to locate the mother. Subsequently, DCFS learned that the mother “might be in Texas” and that she had not visited the children since April 2013.
On November 19, 2013, an instanter order was entered and the children were placed in the temporary custody of DCFS. On November 21, 2013, a continued custody hearing was held. Although the parents of the children did not appear, the attorneys who had been appointed to represent the parents were present.[6] The *748 attorney appointed to represent the children was present and waived the children’s presence. The DCFS case worker’s affidavit was introduced into evidence. The juvenile court found that there were reasonable grounds to believe the children should remain in the .custody of DCFS. The court also appointed a Court Appointed Special Advocate (“CASA”) volunteer to advocate the interests of the children.
On December 19, 2013, the .state filed a petition to declare the children in need of care, pursuant to LSA-Ch.C. art. 606. The state alleged as' follows: the children had been physically abused by one of their caretakers; the children suffered from lack of shelter due to the actions of their caretaker; and, the children suffered from dependency because “the | ¿parents are missing and the caretakers have not been caring for the children properly.” .
A hearing was held on January 6, 2014. The parents of the children appeared in court with counsel and entered a general denial of the allegations. The juvenile court expressed the seriousness of the matter and advised the parents as follows:
The results of- these proceedings could ultimately end up with a permanent removal of your children from your care and custody. So these are very serious proceedings and I urge you to work carefully with your attorneys. I also urge each of you to make sure you’re communicating with your case worker, that you understand what is being required, of you in your case plan, and that you make every effort possible to complete the case plan.
Both parents stated that they understood the juvenile court’s comments and instructions.
An adjudication hearing was held on February 6,' 2014, during which the parents stipulated that the children were in need of care. The juvenile court found that there was a factual basis for the finding that the children were in need of care and signed a judgment to that effect.
Thereafter, a series of case review and permanency hearings were held. During the hearings, the evidence established that the parents were working on their case plans. The mother had obtained employment and had secured adequate housing for herself and the children. Additionally, she had completed a mental health assessment and a substance abuse assessment (all of the mother’s drug screens were negative). Throughout the proceedings; the-case plan provided, “The goal is reunification and the [ (¡concurrent goal is adoption.”
■ By March 2014, the four younger children had been placed in'counseling due to varying degrees of mental and behavioral issues. Subsequently, K.F. was diagnosed with • bipolar disorder, post-traumatic stress disorder (“PTSD”) and attention deficit hyperactivity disorder (“ADHD”). He exhibited disruptive and sometimes violent behavior in the Children’s Home and at school. P.F. was also diagnosed with ADHD. He displayed “violent temper tantrums” and aggressive behavior, and he was reported to be disobedient and defiant. He also experienced night terrors as a result of the physical abuse he had endured. P.F.’s. disruptive behavior caused him to be removed from his first private-home foster, care placement. The male twin, C.F., was diagnosed with ADHD. He and his twin sister, C.F., also had difficulty adjusting and were removed from them first private-home foster care placement due to behavioral issues.
During the early stages of these proceedings, the father was living arid work- *749 mg in New Orleans. However, in April 2014, he returned to West Monroe to live with the mother of the children; Initially, he exhibited .some success in working on his care plan. However, he began to test positive for illegal, drugs and he was non-compliant with his mandatory substance abuse treatment.
At a permanency hearing held on August 18, 2014, the parties discussed a plan to' gradually begin to transition the children back into the care of the mother. According to the plan, the oldest child, A.F., would be the first child to be placed into the mother’s home. Oh November 21, 2014, |7A.F. was returned to the custody-of the mother.[7] The .parents continued to live together in a trailer park in West Monroe. Both, parents were employed and their combined incpme was sufficient to meet the needs of the family.,
Subsequently, on November 28, .2014, the mother and the father- had a physical altercation that was witnessed by A.F. When police officers arrived on the scene, the mother informed the officers that the father had hit her in the face with a closed fist, “slammed” her sister’s head against a cabinet and pushed her niece to the ground. Á.F. was not physically harmed during the altercation. The father was arrested and charged with domestic abuse battery, simple battery, cruelty to a juvenile, resisting an officer and possession of synthetic marijuana. A restraining order was-entered against him, prohibiting him from visiting’ or contacting the mother. However, the two remained in contact’ and on December 15, 2014, the mother went to the district attorney’s office and completed a “drop slip request.” She stated that she desired to drop the charge of domestic abuse battery.[8]
In January 2015, the mother expressed her concerns to the DCFS case | «worker with regard to A.F. She stated that A.F. had been “very disrespectful” to her and had threatened to hit her with a hammer. The case worker referred A.F. and the mother to family counseling. The father also attended some of the sessions.
The record reveals that the visits between the mother and the children were uneventful when they were held at the DCFS office. However, the DCFS worker described the visits at the mother’s home as “chaotic and unorganized.” The worker reported that the children would not sit down, were “running- in - and out’ of the house,” and the mother was unable to control them. Although the mother had been asked to provide “healthy’snacks” for the children, the snacks provided contained high amounts of sugar, which seemed to contribute to the children’s' behavior. Further;'the DCFS worker expressed her concern that the mothbr continued to be financially dependent on the father.
*750 On February 19, -2015, the parties returned to court for a review hearing. During the hearing, DCFS expressed its willingness to continue to work with the parents. The court addressed the domestic abuse incident, and the mother stated that no incidents of domestic violence had occurred since the incident in November 2014.[9] The father informed the court that he l9was living with his father but he continued to pay the rent at the mother’s trailer so that A.F. and the mother would have a- place to live. The permanent plan for all of the children remained “reunification with a concurrent goal of adoption.”
In March 2015, the CASA volunteer prepared a CASA court report in which she expressed her observations that the mother “seems to have difficulty disciplining the children.” The volunteer recommended that the children be maintained in their current placements and asked the court to reconsider the family visits. Thereafter, in June 2015, the CASA volunteer prepared another report in which she expressed her concern about the children’s behavior and the mother’s inability to maintain stability in her home. The volunteer stated, “[I]t is this CASA’s belief .that to bring the twins home in the constant bickering and arguing that goes on between [A.F.] and her mother would be detrimental to the progress they have made.” The volunteer further stated that she did not believe the mother possessed “the skills required to handle these children at this time.”
Another review hearing was held on June 18, 2015. The juvenile court noted that the father was back in the home.' The court expressed its concern about these living arrangements, describing the relationship between the parents as “volatile.” The court also noted the father’s continued drug use. The court informed the mother that she had “some decisions to make” and warned her that her decision to continue to allow the father to live in the home could potentially impact her progress on her case plan.
|inBy October 2015, the mother and the father no longer lived together.. On October 16, 2015, the juvenile court approved unsupervised weekend overnight visits between the mother and three of the four younger children, P.F., C.F. and C.F. A DCFS case worker spoke to the children after the first weekend visit; the children did not report any problems with the visit. Following the October 28-25, 2015 visit, DCFS learned that the father had spent at least one night in the mother’s home while the children were present. When the mother was initially questioned about the incident, she denied allowing the father to spend the' night in her home. However, she later admitted that the father stayed in her home that weekend, but stated that she was unaware that he was not allowed to do so. The records revealed that the father continued to test positive for illegal drugs and had not completed his substance abuse program. Consequently, DCFS terminated the overnight visits in the mother’s home 'and referred the mother to visit coaching for the second time. Neverthe *751 less, DCFS maintained the goal of reunification of the. children with.the mother.
In November 2015, the CASA volunteer prepared another CASA court report, in which she expressed her concern about the mother’s inability “to make decisions that are in the best interest of the children”; the mother’s inability to maintain stability in the home; and, the mother’s inability to manage the children and their behavior. The volunteer stated:,
[[Image here]]
While [the mother] has completed her case plan, she has not demonstrated proper supervision for her children in regards to [the father]. [The mother]’s and [father]’s relationship has been bne of volatility and instability, no continuity or consistency, which is necessary for these | n children to continue to progress and thrive. From this CASA’s observations, [the mother] does not have the parenting skills needed to care for these children. These children need strong and structured parenting to thrive. It is this CASA’s recommendation that these children stay in their current placement and the goal change to Adoption.
⅜ ⅜ ⅜
Dr. LaWanna Gunn-Williams, a licensed family therapist, began counseling the four younger children in March 2014. On October 16, 2015, Dr. Gunn-Williams prepared a letter for the juvenile court, detailing the progress the children had made. With regard to P.F., C.F. and C.F., she stated, “I have witnessed these three children progress from depressed, uncontrollable, angry, disobedient individuals to happy, loving, self-assured and caring children.” Dr. Gunn-Williams also stated:
[[Image here]]
I have recommended to [DCFS] that should the mother get custody, [K.F.] should be placed first since he has the most needs and requires unlimited one-on-one time and attention. My rationale is why disturb the other children who are happy and doing so well, if permanent custody will not work? Having [K.F.] in the home for several weeks will be an eye-opener for this mother and a test on her ability. She already reports problems controlling the ten-year-old daughter who is with her. She states she is working at least five days a week, but I’m concerned about the safety and structure for the kids while. she works and while she’s home. She also states that the father is no longer in the home, but this is truly questionable. I know that I express your sentiments when I say that I am very concerned that these children not be placed in an environment that is detrimental to their well-being. After family visits, [K.F.] and [P.F.] complain that their ten-year-old sister has been ‘mean’ to them. The twins see their visits as just that — visits,-for they are'usually eager to get home to their foster parents.
All of these children have undergone tremendous battles and are just beginning to be able to lead normal lives. I shutter [sic] to think what will happen to them if they are | ^removed from their safe havens and placed in a dysfunctional home environment.
* * *
On November 6, 2015, Dr. Gunn-Williams prepared another letter to the court, in which she reported that after DCFS initiated the weekend visits with the mother, P.F. had begun “to display symptoms of anxiety, confusion, and depression” and he had begun “to act out in disobedience.” With regard to K.F., Dr. Gunn-Williams stated, “[K.F.] has never shown a strong desire to be with his natural mother, and he only mentions her when asked *752 about her.” As to the twins, Dr. Gunn-Williams stated:
[The female twin] started displaying more clinging behavior and waking during the night when the weekend visits with her mother started. She was irritable and complained of stomach aches daily. Since visits have ceased, she is back to her normal state of being and is content.
[The male twin], on the other hand, greets me each week with, T want to stay with [the foster mother] forever!’ He has shown signs of relief and relaxation since learning that he did not have to spend the night at his natural mother’s home.
: ⅝ ⅜ ⅜
Further, Dr. Gunn-Williams opined that the children’s current home environments were “the best permanent placements for them.” She • also recommended allowing occasional visitations with the siblings but limiting visitations with the mother, stating, “I am not sure that such visitations would render any positive benefit for these children.”
■ By November 2015, the father had discontinued his compliance with the case plan: he stopped attending' family visits; he tested positive for drugs on several occasions; he failed to complete substance abuse classes; and, he 1 ^failed to complete the court-ordered batterers-’ intervention program.
On January 12, 2016, Tamara Thompson, the social worker who provided visit coaching services for the family, submitted a report. She noted that she had observed three family visits and had observed the affection the mother displayed toward all the children. However, Thompson stated:
[The mother’s] passive style of parenting limits her ability to effectively deal with children with behavior problems.
[[Image here]]
Although this service recommends a 30-day trial placement with - the children that she share a bond and attachment, [the mother] has not shown considerable progress. [The mother] lacks advanced level parenting skills to handle multiple [children]. With the assistance of her family, it is my professional opinion that [the mother] can handle two children.
* * *
■ On January 15,2016, Dr. Gunn-Williams wrote a letter to Takia Boyette, the DCFS case worker assigned to the family, detailing the progress made by K.F., P.F., C.F. and C.F. Dr. Gunn-Williams stated that P.F. had informed her that his mother had stated to him that Dr. Gunn-Williams and the CASA volunteer were the reasons he was not allowed to live with his mother. P.F. also stated that his mother had instructed him to tell Dr. Gunn-Williams that he wanted to live with her (the mother). With regard to K.F., Dr. Gunn-Williams reported that he became disobedient and “extremely hyperactive” after each family visit and he was “uncharacteristically rude” during his last session with her. Further, she stated that the cottage parents had reported to her that K.F. had been angry and confused since his last family visit, but K.F. was unable to express the 1 ureason for being so. Additionally, Dr. Gunn-Williams stated:
Because of the mental and emotional needs of these children and the. undeniable progress that they have made — socially, emotionally, physically, and behaviorally, I am wholly convinced that they are in the home environments that are definitely needed. Even though I am- basing my professional opinion on the facts and actual evidence revealed *753 through my one-on-one interaction with these children, their foster families, and their schools, I can understand the desire of a natural mother to regain custody of her children. I am-not-aware of the progress that the mother has made towards regaining custody, nor do I know what the future will hold for the children under her care. I can only state with certainty that parenting these children, who have special and individual • emotional needs, will not be easy. I do believe that such a move will be a test of their emotional stability; yet, I am also of the opinion that keeping them in this judicial process for such a long period of time is detrimental to their mental stability. They desperately need a definite ending to these ongoing legal procedures.
* * ■ *
On,February 4, 2016, the DCFS prepared a report for the court in which the agency recommended that the, goal for P.F., K.F., C.F. and C.F. be changed from reunification to adoption and that custody of A.F. be returned to the mother. By this time, P.F., K.F., C.F. and C.F. had been in the custody of DCFS for over two years.
On February 12, 2016, the CASA volunteer prepared another report in which -she expressed concerns about - the mother’s ability to parent the children. She also expressed her concern about the mother’s “hostility” stemming from ’the volunteer’s recommendation to change the goal to adoption with regard to the four younger children. Again, the CASA volunteer recommended maintaining the children in the current placements and changing the goal from reunification to adoption. ■ ■
hfiOn February 18, 2016, the juvenile court held a permanency .hearing.[10] Boy-ette testified that the mother had completed each aspect of the case plan and had “cooperated with whatever we’ve asked her to do.” She stated that DCFS changed the goal from reunification to adoption because “we can’t recommend placing the other kids in the home, based off [the mother’s] visit coaching.” More specifically, Boyette testified:
[The mother] had a hard time disciplining the children. * * * So we moved - [the visits from the DCFS office] to the park so that ⅜’ * * the kids could * * * have more of a chance to interact with each other. [The mother], over the last two years, we’ve been trying to -work with her to step up * * * as the mother of the children. And so we haven’t seen progress. We can’t. * * * speak on, the progress that we were — -we’ve been waiting for her to step up and we haven’t seen that.
[[Image here]]
We referred her to visit coaching two ' Separate times with Ms. Tamara Thompson.
* ⅛ # ,
And so this recently — December—we referred her after our hearing in November to visit coaching again so that she could, um, maybe demonstrate what she’s learned in parenting. And, according to Ms. Tamara- Thompson and myself, we still have yet to see where she *754 could parent by herself, or parent at all, the four children, five total.
[[Image here]]
Because P.F., he’s seven. He has behavior issues, ADHD and he takes medication for his behavior issues. [K.F.] has PTSD, ADHD, dis — I guess regulation mood disorder. He has multiple diagnoses. And we just feel that maybe she can’t handle the children[.] [W]e’ve given her multiple chances to show us that maybe she can handle the children, and we just haven’t seen that.
[[Image here]]
[K.F.] was suspended, maybe two weeks ago. He doesn’t do well in school. He can’t — he just doesn’t do | ^well in school. We have to — he gets suspended often. He’s even been expelled, you know, in these last two years he’s been in care.[11]
* * *
[During visits], [t]he children have fun with each other. They look forward to the visit with each other, not so much as to see their mom.
* * *
[After visits], [K.F.], for example, once he goes back to his cottage, or his placement, they have a hard time calming him down because of his, you know, emotional levels are higher and he’s either angry or super excited. And so they have a hard time calming him down after the visits. [P.F.], he’s sad after the visits because [P.F.] is confused. He doesn’t know if he — well, he thinks he wants to go home but then he wants to stay where he is. So he’s very emotional after the visits. And [C.F. and C.F.] are indifferent. They don’t express anything after the visits.
* * *
Further, Boyette testified with regard to the DCFS’s decision to terminate the weekend “transition” visits with P.F., C.F. and C.F. She stated that the agency was concerned about the father’s presence in the home during the weekend visit because the father had tested positive “for meth[amphetamine]” and he had not completed the mandated substance abuse classes. Boyette testified that it was in the children’s best interest to change the goal from reunification to adoption because the children had been in DCFS custody for over two years and the agency was “looking for the children to have some form of permanency at this point.”
On cross-examination, Boyette conceded that the mother had “complied with everything the Agency asked her to do.” She also conceded |17that K.F. had behavioral issues, despite not being in the mother’s custody. However, Boyette expressed her belief that the mother was not “doing everything she can to discipline him correctly.” She stated, “We have never seen her actually attempt to discipline [K.F.].” She described an incident during which K.F. slapped one of his siblings during a visit and the mother failed to step in to discipline him. Rather, the mother “started laughing” at KF.’s behavior. Boyette also testified that Thompson, the visit coach, was present and observed the incident. Thompson instructed the mother with regard to the proper discipline; however, the mother did not respond to Thompson’s instructions.
*755 . Additionally, on cross-examination, Boy-ette testified that DCFS had not attempted any weekend transition visits in the mother’s home since October 2015. Rather, the agency referred the mother back to visit coaching in an attempt to “see [the mother] exhibit or demonstrate her parenting skills * * * before we started transitioning them again.” She opined that the mother “didn’t look out for the children’s best interest whenever she made that decision [to allow the father to spend the night during the children’s visit].” Boyette admitted that DCFS had not attempted counseling with the mother and the four younger children. She reiterated that the mother had done everything her case plan required her to do “except demonstrate the skills she learned in parenting.” Further, Boyette testified that the visit coach had expressed her recommendation to allow “no more than two children in the home” at the same time.- However, Boyette testified with regard to the conundrum that doing so would entail. She stated:
hs[W]e don’t feel comfortable placing [P.F.] because of his — he does need a lot of structure and his foster parents has— have worked hard to get [P.F.] to where he is. [K.F.] also. Without the one-on-one help that [KF.’s cottage parents] really do with [K.F.], we just can’t — we don’t feel that he would do well in her home. And the twins,- [C.F. and C.F.]. when the children first came into care, [C.F. and C.F.] didn’t know that [the mother] was their mother. And so they have been out of the home with [the mother] since they were bom. And so * * * they are very attached to [their foster mother], and so we just don’t want to disrupt that.
[[Image here]]
That’s the only stability they’ve had since they’ve been in care.
[[Image here]]
Moreover, Boyette testified that DCFS had unsuccessfully attempted to instruct the mother with regard to “the structure” required for P.F. and K.F. on multiple occasions.
In response to questions from the juvenile court, Boyette testified as follows: visit coaching is more “hands on” than parenting classes and can be used as an opportunity to encourage appropriate behavior or to redirect a parent to do more appropriate parenting; the mother had been referred to visit coaching on two separate occasions during these proceedings; Odom, in whose care the mother left the children, is not related to the mother; at the time of the hearing, Odom lived in the same trailer park as -the mother, in a trailer directly in front of the mother’s; DCFS, employees had requested that the mother get a protective order against Odom for A.F.,. since A.F. is in the home with the mother; and, the mother has not attempted to obtain a protective order.
Dr. Gunn-Williams also testified at the hearing. She was accepted by the juvenile court as an expert in the area of marriage and family therapy |19and psychotherapy. Dr. Gunn-Williams testified that K.F., P.F., C.F. and C.F. “are experiencing extreme anxiety.” According to Dr. Gunn-Williams, the anxiety of K.F. and P.F. results from their uncertainty about “what’s going to happen to them in the future, where they’re going to live, who they’re goiiig to be with.” She stated that the twins exhibited anxiety when the time for 'family visits grew near because “they were afraid they were going to be removed from -their foster home.” Dr. Gunn-Williams opined that K.F., P.F., C.F. and C.F. would be negatively affected by an attempt .to transition them back into the *756 mother’s home. She stated that it would be difficult for the mother to parent all of the children due to special needs of K.F., P.F., C.F.- and C.F. Dr. Gunn-Williams stated, “They are going to need extensive care and one on one care and attention.” She also testified that the children’s need for structure and stability was being provided in their current placements.
On cross-examination, Dr. Gunn-Williams testified that she did not believe the children' were afraid of their mother. She stated that she believed K.F. and P.F. loved the - mother; however, the twins “don’t know her as well” because they were very young when they lived with the mother. Further, Dr. Gunn-Williams testified that she had “not explored” how the children would cope< if all contact with the mother were terminated. She opined that the children needed permanency and if it was not provided, the children would experience “more problems, more mental problems within them than we’re seeing right now.” Dr. Gunn-Williams emphasized that she was not advocating for the termination of the mother’s parental rights. She Unstated, “I’m asking the Court to just give these, children the stability thatffiey need.” Further, Dr. Gunn-Williams testified that she had never provided counseling for the mother. However, she stated that she had observed the mother’s interaction with KF. at a facilitation meeting. She. stated that KF. became disruptive and would not stop laughing. As the cottage parents attempted to gain control of the situation, the. mother began to laugh along with K.F. Dr. GunnrWilliams admitted that counseling could, potentially be beneficial for the mother and the children.
In response to questions posed by the juvenile court, Dr. Gunn-Williams stated: she had observed A.F. and KF. playing together; P.F., KF. and the male twin had expressed that they do not like A.F. because “she’s mean to them when they go on visits”; the twins are bonded with each other because “they have been together all their lives and they depend on each other”; KF. and P.F. like to play with their siblings; she counsels- the children individually and has only had the opportunity to see the twins together; she could not, in good faith, recommend that KF., P.F., C.F. and C.F. be returned to the custody of the mother because “they’re handfuls in terms of providing their needs” and it would be very difficult for the mother to handle caring for all of them; and, it would be detrimental for the children to live in such close proximity to Odom’s home.
The mother also testified, stating as follows: she has complied with every aspect of her case plan; ‘ she does not understand DCFS’s concern about her ability to parent her children because she has “never had the chance to parent” them; she did not have any problems during the children’s |⅞1 first weekend transition visit; the children got along well and she did not have to discipline them; during the second weekend visit, the father spent one night in her home; DCFS had never told her that the father was not allowed to be around the children; the restraining order had been dropped by that time; she disciplines A.F. by taking “stuff from her”; KF. “tapped [C.F.] on the face” but he did not “slap” him; she laughed at KF.’s behavior because “that’s just me. I laugh at anything”; she gave KF. an ice cream cone after the incident because she tries to spoil the children, as she does “not see them as often”; she has benefitted from participating in counseling with A.F. and she would benefit from having counseling ■with KF., P.F., C.F. and C.F.; she wants custody of all of her children; she does not “want to pick and choose” between the children; when she discovered that. Odom had moved into the same trailer park, she called the sheriffs department; she later *757 learned that the restraining order had expired; she did not attempt to get another restraining order; A.F. has not made any comments about Odom living in such close proximity to them; if the other children are returned to her care, they might “have memories” with Odom living nearby; she cannot afford to move from her home but would if she had to do so; it will “be hard” to control and/or discipline all of the children if they are returned to her. custody; she would accept any services. that are available to assist her with the children; she does not want all of the children to be returned to her custody at thé súme 'time because “I don’t think I could handle it. I know I couldn’t”;- and, she would be able to handle the children if they are slowly transitioned back into her care.
|220n cross-examination, the Mother ttiok issue with Dr. Gunn-Williams’ opinion that the children should not be retarded to her custody. The mother stated, “I don’t think it’ll be a problem. I just, don’t think [Dr. Gunn-Williams] wants me to get my kids is what it is.” The mother also testified that she did not believe Dr. Gunn-Williams was being truthful when ,she testified that P.F., K.F. and the maje twin had stated that they did not like being around A.F,
. Additionally, the mother testified that she did not know if she would be able to financially support all five of the children. She stated that she provided for A.F. by working and receiving “food stamps,” She also expressed her desire to “go back to school and try to do that and try- to: get a better education to * * * make móre' money.” However, she admitted that,she had not made any attempts to go , back to school or to look for better jobs to earn a better salary.
- Esperanza Cannon, the children’s maternal grandmother, also testified at the hearing. She testified as follows: she has a close relationship with the mother; she lives in close proximity to her and she sees the mother and A.F, every day; the mother and A.F. have a good relationship; the mother disciplines A.F, by taking her cell phone away and limiting her television time; she attends every DCFS visit with the mother and she has seen the mother interact. with K.F., P.F., C.F. and C.F. during those visits; the children are “wild and rambunctious’.’ during most visits; the mother “tries to keep control of all of them” and does not have any problems doing so; she has observed the mother disciplining K.F., P.F., |gsC.F. and C.F.; the children obey their mother; she saw K.F. slap the male twin during one of the visits but “it.wasn’t a hard slap”; the mother did not discipline K.F. because “I don’t think she really thought much about it at that point, but it was discussed after-wards”; the mother “should have done something [about the slapping incident]” but she didn’t”; the mother should be given the opportunity to get all of the children back but “not all four of them at one time”; getting, all of the children at one time would be difficult for the mother because “that would be hard for anybody”; and, she and her brother are willing to assist the mother with the children.
In response to the juvenile court’s questions, Cannon testified as follows: she has prior felony drug convictions; she was aware that the children were living with Odom; she and her fiancé had attempted to go to Odom’s home to take the children out to eat, but Odom would “slam the door in our faces”; she and her fiancé had told the DCFS worker that they would “rather get two other kids here and y’all take [A.F.] back because she’s showing out”; she made the remark in the presence of A.F. because,she was trying to get A.F. to “straighten up and behave”; and, she attends all of the family visits with her *758 daughter and the children because she loves her grandchildren.
After hearing the testimony and reviewing the evidence, the juvenile court found that with regard to K.F., P.F., C.F. and C.F., a change of the permanent plan of reunification to adoption was the most appropriate, least restrictive setting under the circumstances. The court also suspended the visitation between the mother and the younger children for 60 days.
Iz/The mother appeals.[12]
DISCUSSION
The mother contends the juvenile court erred in changing the permanent plan from reunification to adoption because the state failed to meet its burden of proving the change was justified. The mother argues that the only reason the plan was changed was because the father spent the night at her house during one of her unsupervised overnight visits with P.F., C.F. and' C.F. She also argues that she has complied with every single aspect of her case plan and she has demonstrated her ability to parent A.F., who has been in her care for over a year. Further, the mother argues that DCFS should have provided more instructions or counseling for her and the four younger children, rather than terminating the home visits and changing the plan from reunification to adoption.
Title VI of the Louisiana Children’s Code, ie., LSA-Ch.C. arts. 601-725.3, sets forth the provisions regarding children in need of care proceedings.[13] LSA-Ch.C. art. 681(A) provides:
In a case in which a child has been adjudicated to be in need of care, the child’s health and safety shall be the paramount concern, and the court may do any of thej^following:
(1) Place the child in the custody of a parent or such other suitable person on such terms and conditions as deemed in 'the best interest of the child including but not limited to the issuance of a protective order pursuant to Article 618.
(2) Place the child in the custody of a .private or public institution or agency.
(3) Commit a child found to have a mental illness to a public or private institution for persons with mental illness.
(4) Grant guardianship of the child to a '■.nonparent.
(5) Make such other disposition or com- ; bination of the above dispositions as the court deems to be in the best interest of the child.
Under LSA-Ch'.C. art. 683(A), the trial court shall impose the least restrictive disposition of the alternatives that the court finds is consistent with the circumstances of the case, the health and safety of the child and the ■ best interest of society. LSA-Ch.C. art. 702 provides, in pertinent part:'
[[Image here]]
*759 C. The court shall determine the permanent plan for the child that- is inost appropriate and in the best interest of the child in accordance with the follow- • ing priorities of placement: '•
(1) Return the child to the legal* custody of the parents within a specified time period consistent with the child’s age and need for a safe and. permanent home. In order for reunification to remain as the permanent plan for the child, the parent must be complying with the case plan and making .significant measurable progress toward -achieving its goals and correcting the conditions requiring the child to be in care.
(2) Adoption.
(3) Placement with a legal guardian.
12(j(4) Placement in the legal Custody of a relative who is willing and able to offer a safe, wholesome, and stable' home for the child.
(5) Placement in the least restrictive, most family-like alternative' permanent living arrangement. The department shall document in the child’s case plan and its report to the court the compelling reason for recommending'this pl'án over the preceding higher priority alternatives.
* * * ■
The trial court shall consider a child’s need for continuing contact with any relative by blood, adoption or affinity with whom the child has an established and significant relationship as one of several factors in determining the permanent plan that is most appropriate and in the best interest of the child. LSA-Ch.C. , art. 702(D). The trial court shall determine whether the department has made reasonable efforts to reunify the parent ahd child or to finalize the child’s placement in an alternative safe and permanent home’while considering that the child’s health and safety will be the paramount concern in the court’s determination of the permanent plan. LSA-Ch.C. art. 702(E). More than simply protecting parental rights, our judicial system is required to protect the children’s rights to thrive and survive. State in the Interest of C.S., 49,955 (La.App.2d Cir.3/18/15), 163 So.3d 193.
An appellate court’s review of a juvenile court’s permanent placement determination is governed by the manifest error standard. State in the Interest of N.C. & M.G., 50,446 (La.App.2d Cir.11/18/15), 184 So.3d 760; State ex rel. C.M. v. Willis, 41,908 (La.App.2d Cir.12/27/06), 946 So.2d 316, writ denied, 2007-0190 (La.2/16/07), 949 So.2d 413. In a |27manifest error review, it is important that the appellate court not substitute its own opinion when it is the juvenile court that is in the unique position to see and hear the witnesses as they testify. State in the Interest of N.C. & M.G., supra; State in the Interest of L.M., 46,078 (La.App.2d Cir.1/26/11), 57 So.3d 518. Where there is conflicting testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even when the appellate court may feel that its own evaluations and inferences are as reasonable as those of the juvenile court. Id. If the juvenile court’s findings are reasonable in light of the record reviewed in its entirety, the appellate court may not reverse, even though convinced that, had it been sitting as the trier of fact, it would have weighed the evidence differently. Id.
In the instant case, we must first note that the termination of the mother’s parental rights is not at issue. The sole issue before this Court is the juvenile court’s ruling which changed the permanency goal from reunification to adoption.
We have reviewed this record in its entirety. In support of its ruling changing *760 the permanency plan from reunification to adoption, the juvenile court stated:
* * *
I think that it is very important to note that Mother wants her children back. That has been abundantly clear. Mother has completed most of the things on her case plan. She has cooperated, for the most part, with the Agency. The problem that we have, and this was substantiated by the testimony and the record, that Mother is not able to demonstrate her parenting skills. She’s been through the class. She’s had the visiting coach, which is extra, twice already. And she’s still not liable to demonstrate the parenting skills.
[[Image here]]
[T]he children do have significant behavior problems. And that means that mom has to have a higher level of parenting skills than she would have to have if these children did not have the behavioral problems that they do. The evidence in this case strongly supports Mom’s poor decision making. ' Mom allowed [the father] in the home. Even if she didn’t know that he wasn’t supposed to be there from the Agency’s standpoint, I can conceive of no circumstances in which that would have been a good decision for these children. [The father] is a known drug addict. He has engaged in domestic violence with .the mom in the presence of the children. And to have him in the home is detrimental to the children.
[[Image here]]
The record is clear that Mom continues to struggle with parenting of [A.F.]. And that is one child with the 'least number of behavior problems.
⅜ ⅜ ⅜
[I]t is clear that these children need a lot of strtícture, a lot of individual attention. And it is clear, for whatever reason — and I don’t know if it’s due to Mom’s immaturity, her lack of capacity, or her unrealistic expectations or understanding of their behavioral needs, it’s clear that she doesn’t have the capability . and the skills to parent them or to make the decisions to fully protect them.
* * *
We agree with the juvenile court’s findings. • K.F., P.F., C.F. and C.F. have been in DCFS custody since November 2013, and DCFS has made reasonable efforts to reunify the mother and the children. It is clear that the mother was successful in regaining custody of the oldest child. However, the record demonstrates that the mother has struggled with her ability to parent A.F., even with the assistance of counseling; .Additionally, a review of the record reveals that parenting K.F., P.F., C.F. and C.F. proved to be difficult for the mother. In fact, the mother admitted that it would “be hard” to parent all of the children if they are returned to her custody. Dr. 12aGunn-Williams, Boyette, Thompson and the CASA volunteer all agreed that the mother did not demonstrate the parenting skills necessary to parent all five children simultaneously. Although the mother was provided the assistance of a visit/parenting coach to assist her with the care and discipline of her children during supervised'visits, the testimony and documentary evidence established that she did not “step up” to effectively parent and/or discipline her children.
We. find that the decision of the juvenile court, that the permanent case plan be changed from reunification to adoption, is in the best interest of the children and is ■the most appropriate, least restrictive measure under these circumstances. The *761 juvenile court’s ruling is fully supported by the record and is not manifestly erroneous.
CONCLUSION
For the reasons set forth herein, we affirm the decision of the juvenile court changing the permanent case plan for the children in this matter from reunificatidn with the mother to adoption. Costs of this appeal are assessed to the mother.
AFFIRMED.

. Odom told the investigator that the children had been in her custody for approximately four years. However, prior DCFS records indicate that the children were in the mother’s custody in 2010. More specifically, in 2010, DCFS investigated the mother for "lack of supervision” when then five-year-old A.F. was found wandering around an apartment complex. The child had bruises on her back and left side and a "cut” on her bottom lip. She told DCFS workers that her mother and two of her aunts had "whipped [her] with a belt.” The four younger children were found on the floor “screaming” while the mother slept. Further, one of the twins was found with a “cord wrapped around her neck and arm while lying on the floor[.]” The mother was cited for child neglect.
• In 2012, DCFS investigated the family again, while the father was in a substance abuse program. According to the report, a Weflspring employee went to the home and found the father "passed out on the sofa” while the children were in the home unattended. At that time, the mother reported that the father had put her out of the house but had allowed the children to remain.

. A.F., who was eight years old, informed the DCFS investigator that Odom and Frost spanked her and her siblings "every day” for offenses such as "messing up the house, playing in water [and] playing outside.” A.F. also stated that Odom and Frost would hit her and her siblings “with a back scratcher on their bottom[s] really hard.” Further, A.F. stated that Frost spanked her and her siblings several times the previous day while Odom was outside smoking cigarettes.
The DCFS investigator also observed a bruise on the buttocks of K.F., who was six years old. However, K.F. refused to tell the investigator how he received the bruise. P.F., who was five years old, also had a bruise on his buttocks. He informed the investigator that Frost spanked him "every day, really hard with a back scratcher.” A further investigation revealed bruises on the buttocks and side of the male twin. The female twin also had bruises on her buttocks, side and back. The female twin informed the DCFS investigator that she had been spanked with a back scratcher.

. K.F. and P.F. later described incidents in which Odom would pour Tabasco sauce down their throats to punish them for being disobedient.

. Odom and Frost were arrested and charged with child abuse.

. The DCFS investigator entered Frost’s bedroom and observed "a loaded gun that was cocked and lying next to the bed.” The bedroom, which was unlocked, also contained several samurai swords hanging on the wall.

. The mother’s attorney informed the court that the mother was “temporarily in Texas” and was expected to return to Monroe the following week. The father's attorney stated that his client, who lived and worked in New Orleans, was unable to attend the hearing *748 because he did not learn of the proceedings until the morning of the hearing.

. K.F. remained at the Louisiana Baptist Children’s Home in Monroe, where he had been since the children entered DCFS custody. P.F’. had been moved from the Baptist Children's Home to a certified nonrelative foster care placement in Rusten. - Thereafter, due. to his behavioral issues, he was removed from that home and was placed in another non-relative foster home in Sterlington. With re- . gard to the twins, sifter the initial foster care placement failed due to their disruptive behavior, they were placed in a certified non-relative foster home in Oak Grove. •

. On the form, the mother stated;
We have five kids together that are in state custody!.] [W]e just got one back in the home and are in the process of getting the rest back. In order to regain custody, I need him back in the household to keep our household billing up [sic] such as rent, lights, water and etc. [P]lease take this into consideration!.] [W]e have not had an[y] problems since February since we got back together to regain custody of our kids.

. The mother also informed the court that the father no longer lived with her; she stated that he came to her house to visit A.F., but he did not stay overnight. Further, the mother admitted that the restraining order remained active and that the father wás “not supposed to come around." She also admitted that she communicated with the father, despite the restraining order, and that she had attempted to have the order "modified or dropped."
Further, the juvenile court noted that the father, who had been referred to Batterer’s Intervention, had not completed the program. It also noted that the mother had been re-férred to The Wellspring for a domestic violence assessment.

. When the hearing commenced, the state proposed an agreement for, the record, that the custody of A.F, would be returned to the mother. The attorneys representing A.F. and the mother expressed their agreement for the record. The father was not present; his attorney stated, "We take no position.” The juvenile court ordered that the custody of A.F. be returned to the mother. This ruling was not appealed and-will not be addressed in this ■ opinion.

. The record reveals that K.F. was expelled from his elementary school and placed in an alternative school during the 2014-2015 school year because of his disruptive, and sometimes violent, behavior. He was allowed to return to his elementary school for the 2015-2016 school year. However, he was again expelled due to persistent disruptive behavior and for stabbing another student with a pencil.

. The father did not appeal the juvenile court's ruling. However, he filed a brief, as an appellee, in which he supported the arguments set- forth in the mother’s brief. Because the father is not an appellant in this matter, this opinion will only address the arguments urged by the mother.

. The health, safety, and best interest of the child shall be the paramount concern in all proceedings under Title VI. LSA-Ch.C. art. 601. A child in need of care proceeding shall be commenced by petition filed by the district attorney. LSA-Ch.C. ar.t. 631(A). DCFS, when authorized by the court, may file a petition if there are reasonable grounds to believe that the child is a child in need of care. Id. A hearing shall be held in which the state has the burden to prove the allegations of the petition by a preponderance of evidence. LSA-Ch.C. arts. 664 and 665. Within 30 days of a child in need of care adjudication, a disposition hearing shall be conducted. LSA-Ch.C. art. 678.