GARRETT, J.
|, This case concerns an infant who was placed in the custody of the Louisiana Department of Children'and Family Services (“DCFS”) shortly after birth. Due to the failure of the mother to comply, the goal of the permanent case plan was changed from reunification with the parents to adoption. The mother has appealed that ruling in proper person. For the following reasons, we affirm.
FACTS
On December 16, 2018, 40-year-old M.S. gave birth to the child at issue here, C.S. The father of the child is H.G. At the hospital, M.S. told the staff that she had been living at the Levingston Motel in Shreveport, but did not want to take the infant back there. She stated that she could live with her sister, L.S. However, L.S.. refused to allow M.S. to live with her due to a previous physical altercation. Because M.S. was homeless and had nowhere to go with the infant upon discharge from the hospital, and because other valid complaints had previously been lodged regarding her other children, the DCFS was contacted. In an instanter order signed on December 19, 2018, the juvenile court determined that C.S. was a child in need of care and gave temporary custody to the DCFS. The child was physically placed with another sister of M.S., K.N., and her husband, E.N.
M.S. had three other young children in DCFS custody who had been living with K.N: and E.N. since June 2013. This occurred after one of the children reported that H.G. had touched her inappropriately and an investigation found that child’s claims to be credible. M.S. did not believe the child, claiming K.N. encouraged the child to make false allegations of 12sexual abuse so that K.N. and E.N. could keep the children for monetary gain. M.S. also had a 15-year-old child she claimed was living with L.S.
In January 2014, the state filed a petition alleging that C.S. was a child in need of care under La. Ch. C. art. 606. The petition set forth the facts outlined above, as well as allegations that M.S. claimed to have tried drugs for the first time in January 2013, and could not understand how a positive drug screen showed up in her hair. The DCFS also claimed that M.S. had' threatened K.N. with physical harm for trying to take away her children. The DCFS alleged that C.S. could not be adequately protected if he remained in parental custody. According to the DCFS, emergency circumstances existed indicating that there was a substantial immediate danger to the health and welfare of the child, precluding reasonable efforts of previous services being offered as an alternative to removal. Those circumstances included neglect due to inadequate shelter, substance abuse, and toleration of sexual abuse. The DCFS asserted there was good cause to believe that C.S. should be removed from the parents pending its investigation and temporary custody should be placed with the state.
On January 29, 2014, the court issued a judgment requiring M.S. to enroll in a drug treatment program called Family Preservation Court; she was given a series of requirements to fulfill. Visitation with C.S. was established, as well as with two of the other children.[1]
*195 In March 2014, the juvenile court issued a judgment of disposition finding that C.S. was a child in need of care, that continued custody would |sremain with the DCFS, and the child would remain -with relatives.[2] A review hearing was set for May 2014.'
In May 2014, the DCFS submitted a letter to the court stating that the case plan had been developed without cooperation from M.S. The case plan action steps for M.S. included the following:
1. [M.S.] will locate and secure housing that is free of any safety hazards and meets the basic needs of her children.
2. [M.S.] will demonstrate an ability to maintain a safe and clean environment by maintaining the same home for at least six months, keeping it free of any safety hazards, maintaining a supply of food, and keeping the home clean.
3. [M.S.] will provide proof of income to worker.
4. [M.S.] will apply for concrete services such as SNAP benefits, SSI, Medicaid, and any other services that may assist in the care/supervision of her child.
5. [M.S.] will participate in both individual therapy and family ... therapy. She will arrive on time. She will notify the Agency and mental health provider of the need to re-schedule an appointment. If transportation is needed, she will notify the Agency within 24 hours. The Agency will assist with transportation when possible.
6. [M.S.] will submit to a mental health evaluation. She will notify worker at least 2 days prior to the scheduled appointment if unable to keep the appointment. [M.S.] will notify worker if unable to arrange transportation to the evaluation at least 2 days in advance.
7.[M.S.] will complete random drug screens as directed by the Agency or substance abuse treatment provider. Failure to comply with random drug screens will be .considered a positive screening.
148. If found appropriate, [M.S.] will participate in and successfully complete an Agency-approved substance abuse treatment program.
9. The Agency will refer [M.S.] for parenting education. She will participate in this program and be able to demonstrate her knowledge gained and understanding of her children’s needs.
10. [M.S.] will attend all Family Team Conferences (FTC’s)/Family Team Meetings (FTM’s), court hearings, visits with her children, and any other appointments regarding her children.
M.S. entered a transitional living facility called Grace Home, but left there claiming it was under investigation by the FBI. According to the DCFS, the real reason she left was she was asked to change rooms with another resident. At that point, M.S. began staying at the Merryton Motel in Shreveport.
M.S. was observed to have, difficulty distributing her attention among the children during visitation. She insisted on giving C.S. a bottle every time he cried, even though the child was on a feeding schedule. M.S. believed that caretakers were neglecting C.S. by not giving him a bottle every time he cried. In February 2014, M.S. was referred to an agency for visit coaching services. Observations of visits from February through April 2014 showed M.S. to be resistant to receiving informa *196 tion and accepting her role in the removal of the children from her care. Visit coaching services were terminated in April 2014, because M.S. refused the services.
A case review hearing was held on August 8, 2014, and a judgment was signed August 20, 2014, continuing the case plan, with a goal of reunification. A permanency/case review hearing was set for December 4, 2014.
|-At the hearing in December 2014, M.S. was present and represented by appointed counsel. The state presented the testimony of Courtney Young, a child welfare specialist with the DCFS. She testified that C.S. was placed in DCFS custody in December 2013, and a case plan for reunification with the parents was formulated. M.S. was to address the areas of substance abuse, housing, income, and parenting. Ms. Young testified that M.S. had not fulfilled the requirements of her case plan.
According to Ms. Young, before C.S. was born, M.S. had completed parenting training in her case plan regarding the other children. In this case, dealing only with C.S., M.S. had been referred to community support services for visit coaching, which she did not complete. Ms. Young testified that M.S. did not have housing, and in court in October, M.S. stated that she was living under a bridge. She had been dismissed from her substance abuse program for noncompliance and for getting into an argument with the staff. M.S. had not done random drug screenings. She did not attend the last Family Team Meeting, as required by her case plan.
Ms. Young observed that H.G., the father of C.S., also had not complied with his case plan. DNA testing showed that he is the biological father of C.S. After H.G.’s release from jail several months before this hearing, he had failed to make his whereabouts known to the DCFS. Ms. Young stated that she prepared a report in November 2014, recommending that the case plan be changed to adoption only, based upon the goal for M.S.’s other three children and the lack of cooperation by M.S. and H.G. Ms. Young testified that C.S. was doing well with his current placement.
IfiM.S.’s attorney cross-examined Ms. Young, who stated that the DCFS thought M.S. needed visit coaching services, but M.S. refused to sign the visit coaching contract. During visits with the children, M.S. was observed to have a difficult time managing C.S. along with the two other children who participated in visits. M.S. directed most of her attention to C.S. One of her older children was extremely rambunctious, requiring frequent attention and correction.. The other child was very quiet and often ignored. The DCFS thought it would be beneficial to have a third party provide guidance to M.S. on how to evenly distribute her attention. This was motivated by the understanding that any person would have difficulty managing a joint visitation.
According to Ms. Young, there was a mental health component to the case plan. M.S. was evaluated by Shreveport Behavioral Health, but she refused to sign a release for the DCFS to receive information about the report. M.S. was asked to sign the release two or three times. Ms. Young stated that M.S. was still basically homeless and had not provided the DCFS with any information about where she was living.
Laura Hyson, with the Volunteers for Youth Justice, was appointed as the court-appointed special advocate (“CASA”) for C.S. She made a report to the juvenile court in December 2014, recommending that C.S. remain in DCFS custody and that the case plan goal be changed from reunification with the parents to adoption *197 only. Ms. Hyson also testified at the hearing. Ms. Hyson stated that at one visit, M.S. terminated the visit after a brief time because C.S. was crying. Ms. Hyson sáid, “She’ll just give up easily |7when he starts crying[.]” Ms. Hyson testified that she did not know where M.S. lives. According to Ms. Hyson, M.S. had stated at an earlier hearing that she was living under a bridge.
She recommended that visitation stop due to concerns that M.S. was concentrating her efforts more on trying to' gain community support for her allegations that the DCFS was mishandling her case rather than on trying to reunify with her child. The state introduced into evidence a letter written by M.S. and distributed to the' community, as well as postings by M.S. on social media. In the letter, M.S. claimed that her children were taken away by the DCFS without cause. M.S. asserted that the DCFS was being investigated by the District Attorney’s office. M.S. sought to have members of the community attend the December 2014 court hearing to support her.
M.S. testified at the hearing. She stated that she has a problem communicating with Ms. Young and that everything Ms. Young said was a lie. She asserted that the person who did her parenting training had a “paper” that said that M.S. and C.S. had drugs in their systems. She denied this and urged that she had blood test results for C.S. showing the child did not have drugs in his system. She stated that she would not sign what the DCFS wanted her to sign until they removed any reference to a positive drug test. However, she also stated that she had not asked that the information be removed.
M.S. exhibited some confusion about whether she. had released her mental health records to the DCFS. She claimed that she had signed the release and that she was not asked to sign more than once. She stated that |Rshe missed one of her visits with C.S. because she went to mental health counseling, but she never told the DCFS that she was receiving counseling.
M.S. said she was discharged from Family Preservation Court after a disagreement when a staff member could not read the drug test results. M.S. suggested that the worker take it over “to the men side” and this was interpreted as not being cooperative. M.S. stated ^hat she never tested positive for drugs. However, she acknowledged that her discharge from -the substance abuse program was not based upon successful completion. M.S. testified that she missed a Family Team Meeting. She claimed she did not know about any other meetings. In later questioning, M.S. was elusive regarding how many Family Team Meetings she knew about and attended.
Regarding her current residence, M.S. claimed she had been living in an apartment with a friend for about a month, but admitted that she had not informed the DCFS of her current address. The friend had a foster child and the juvenile court was acquainted with the identity of the friend. M.S. stated that she had not undergone substance abuse treatment and did not have a job. She said that she received either $356 or $359 in food stamps each month.. Her food stamp allotment included her oldest child, who is 15 and lives with M.S.’s sister, L.S. M.S. said she gave L.S. $200 a month in food stamps for this child. She also testified that she received food stamps, including an allotment for the 15-year-old, for two years when that child was living with his father and she was unaware of his whereabouts.
At the conclusion of the hearing, the juvenile court provided lengthy reasons in support of its ruling. The court noted that, as’ part of the case |splan, M.S. was required to participate in a substance *198 abuse program, find suitable housing, secure appropriate income, receive parenting training, and undergo a mental health evaluation. The evidence showed that she had failed to meet any of these requirements.
The juvenile court carefully considered the evidence and observed that M.S. was dismissed from a substance abuse program as noncompliant. She was required either, to comply or get into another program and she had done neither.
As to housing, M.S. was currently living with someone the juvenile court found to be a questionable person who had a child protection history that prompted a motion for contempt and a motion to compel an interview regarding the child in her custody.
Regarding income, the juvenile court observed that it was not necessary that M.S. have a job, but she had to have income to support a child. While M.S. was getting some financial assistance from her family and from the fathers of some of her children, the court found a clear indication of food stamp fraud, which was not appropriate income.
Regarding parenting, the court had required M.S. to have visitation coaching. This was necessitated because of inappropriate behavior and inappropriate individuals being brought to visitation. The court thought visitation coaching would alleviate some of that problem. However, M.S. refused to cooperate.
The court observed that M.S. refused to sign releases necessary for the DCFS to receive her mental health evaluations and to ensure that she |10was complying with recommendations. The court rejected M.S.’s testimony that she was not asked to sign releases.
The court observed that M.S. failed to attend visits regularly, failed to inform the DCFS of her address and phone number, and failed to attend several, if not most, of the Family Team Meetings.
The court noted that a parent has a year to reunify, which may be extended if the parent is making significant, measurable progress toward alleviating the conditions that required the child to be in DCFS care. The court stated it is very liberal in applying that standard to allow a parent every opportunity to achieve reunification. The court found that the DCFS had done an excellent job trying to achieve reunification in this matter. However, in this case, the court found an utter lack of cooperation by M.S. and a consistent, unreasonable, and inaccurate blaming of every agency or person responsible for helping her. According to the court, “She has blamed those individuals. She blamed Ms. Young. She blamed the visitation coach. She blamed the substance abuse provider[.]” Therefore, the court found the plan could not continue to be reunification; the permanent plan was changed to adoption.
M.S. filed a pro se notice of appeal with the juvenile 'court. Her appeal was granted, limited to C.S. She was granted in forma pauperis status in the appeal order.
LEGAL PRINCIPLES
In the development of a case plan, the health and safety of the child shall be the paramount concern. La. Ch. C. art. 675.
|nLa. Ch. C. art. 702 specifies in pertinent part:
C. The court shall determine the permanent plan for the child that is most appropriate and in the best interest of the child in accordance with the following priorities of placement:
(1) Return the child to the legal custody of the parents within a specified time period consistent with the child’s age and need for a safe and permanent home. In order for reunification to remain as the permanent plan for the child, the parent must be complying with *199 the case plan and making significant measurable progress toward achieving its goals and correcting the conditions requiring the child to be in care.
(2) Adoption.
[[Image here]]
E. Except as otherwise provided in Article 672.1, the court shall determine whether the department has made reasonable efforts to reunify the parent and child or to finalize the child’s placement in an alternative safe and permanent home in accordance with the child’s permanent plan. The child’s health and safety will be the paramount concern in the court’s determination of the permanent plan.
A parent who professes an intention to exercise his or her parental rights and responsibilities must take some action in furtherance of the intention to avoid having those rights terminated. State in Interest of S.M., 98-0922 (La.10/20/98), 719 So.2d 445.
More than simply protecting parental rights, our judicial system is required to protect the children’s rights to thrive and survive. Furthermore, a child has an interest in the termination of rights that prevent adoption and inhibit that child’s establishment of secure, stable, long term, continuous family relationships. State in the Interest of S.M., 98-0922 (La.10/20/98), 719 So.2d 445; State in Interest of P.B., 49,668 (La.App.2d Cir.12/17/14), 154 So.3d 806. While the interest of a parent is protected in a termination | ^proceeding by enforcing the procedural rules enacted to ensure that parental rights are not thoughtlessly severed, those interests must ultimately yield to the paramount best interest of the children. State in Interest of S.M., supra.
To reverse a trial court’s permanency plan determination, an appellate court must find from the record that the trial court’s finding is clearly wrong or manifestly erroneous. State ex rel. H.M. v. T.M., 44,446 (La.App.2d Cir.5/6/09), 12 So.3d 409; State ex rel. J.B. v. J.B., Jr., 35,846 (La.App.2d Cir.2/27/02), 811 So.2d 179; State ex rel. S.D. v. D.M.D.B., 36,406 (La.App.2d Cir.8/14/02), 823 So.2d 1113; State in Interest of P.B., supra.
DISCUSSION
M.S. filed a brief, in proper person, which is lacking in clarity. She basically argues that the trial court erred in changing the permanent case plan, goal for C.S. from reunification to adoption. Her brief includes much narrative about matters that are outside the record. In the first section, M.S. contends that C.S. was taken from her in the hospital due to a conspiracy between the DCFS and her sister, K.N., to take her children in order to receive income from them. She claims that in an early court appearance in this matter, “There was a piece of document going around, which disappeared stating that I could get my children and take them back to the motel I was living at.” However, she contends this did not happen because the juvenile court judge “had a personal vendetta” due to her request to have him recused, claiming he was biased and prejudiced.
In the next section of the brief, M.S. addresses the case plan and the testimony of Ms. Young, the DCFS representative. M.S. states that her case Implan required signing a consent form for medical records, obtaining a mental health evaluation, attending parenting classes, assessment, drug classes and drug court, and parent coaching classes. She claims she did everything that was asked of her and Ms. Young lied in court by saying that M.S. did not comply with the requirements. M.S. contends she reported Ms. Young to the DCFS headquarters in Baton Rouge. M.S. states she then went to the media regarding Ms. Young and wanted to file criminal charges against her.
*200 M.S. claims that her visitation with C.S. was suspended at one point after a verbal confrontation with Ms. Young. She stated that the juvenile court listened to her version of what happened, but seemed “unconcerned and didn’t care to hear what I was telling him.”
M.S. included in her brief a list of eight areas where she felt Ms. Young had lied to the court:
1. M.S. argues that she completed parenting classes, even though Ms. Young says she did not.
2. M.S. urges that Ms. Young reported that she did not sign a medical release form and then the attorney “twisted everything around to make it seem it was more than one form that I had to sign and she reported that I did not sign the second form.”
3. M.S. maintains that Ms. Young reported that she missed some of the drug classes she was ordered to attend. She acknowledges that she missed one class, but made up for it by completing community service at the Salvation Army.
4. M.S. asserts that, contrary to Ms. Young’s information that she did not do a mental health assessment, she did an assessment with Dr. Meek at the “Mental Health Behavioral” on February 5, 2014.
5. M.S. addresses the allegation that she refused to sign a form by the parenting coach staff. She acknowledges 114that she refused to sign the form until reference to C.S. having drugs in his system was removed.
6. M.S. disputes Ms. Young’s testimony that there was an argument with employees of the drug court program which resulted in M.S. being discharged. M.S. urges that she never failed a drug test, but there was a dispute when one of the employees could not read a drug test. She says she refused to admit in group sessions that she used drugs or alcohol, because she does not.
7. M.S. disputes what she perceived was information from Ms. Young that she had failed a drug test. M.S. complained that she did not receive credit for classes she took while living at a place called Safe Haven.
8. M.S. objects that Ms. Young continued to send mail to the Levingston Motel when she was aware that M.S. no longer lived there.
In the final section of her brief, M.S. claims her court-appointed attorney did not help her and she again launches into a diatribe regarding lies she alleged were told by Ms. Young and K.N. in order to deprive M'.S. of her children and conceal their “illegal acts.”
The record in this matter does not support any of the arguments made by M.S. C.S. was properly taken into DCFS custody and adjudicated a child in need of care due to the failure of M.S. to provide suitable shelter for the child at birth, as well as her toleration of alleged sexual abuse of one of her other children by C.S.’s father.
M.S. was given clear goals, which, if she had met them, would have allowed her to regain custody of C.S. M.S. was given one year to demonstrate significant measurable progress toward achieving those goals; she utterly failed to do so.
|1fiShe was required to secure suitable housing for C.S. and to maintain the same home for at least six months. The record shows that M.S. frequently moved from place to place for no valid reason. Testimony established that, at one point, M.S. was homeless. M.S. also failed to keep the DCFS apprised of her current address and phone numbers where she could be reached.
*201 M.S. did not demonstrate proof of income and admitted in court circumstances that may constitute food stamp fraud.
M.S. was required to submit to a mental health evaluation. It is unclear whether this was done, but M.S. adamantly refused to sign the release which would have allowed the DCFS to know if she had complied with this requirement and whether she was receiving appropriate mental health counseling.
M.S. was ordered to attend substance abuse treatment at Family Preservation Court and to submit to random drug testing. She was dismissed from the program due to her noncompliance and difficulties she created with the staff of that program.
The DCFS determined that M.S. needed visit coaching services in order to have meaningful visitation with C.S. as well as with two of her other children. M.S. refused those services. The record shows that M.S. was completely resistant to DCFS efforts to facilitate visitation with the children. M.S. frequently terminated visitation early when C.S. cried.
| ir,The record demonstrates that M.S. did not attend all Family Team Meetings, as required by her case plan. No valid reason was given for her noncompliance with this requirement.
It is clear that, during the course of the year after C.S. was taken into DCFS custody, M.S. failed to comply with her case plan and made no significant measurable progress toward achieving its goals and correcting the conditions which caused C.S. to be a child in need of care.
As found by the juvenile court, the DCFS has made reasonable efforts to assist M.S. in achieving reunification with C.S. However, M.S. has a resistant and combative attitude toward the DCFS and its employees, as well as the staff of all of the other programs designed to aid her. Assistance has been made available to M.S. and she has declined to accept it. M.S. has utterly failed to alter or modify in a significant way the behavior which served as the basis for the state’s removal of C.S.
The decision of the juvenile court that the permanent case plan be changed from reunification to adoption is fully supported by the record and is not manifestly erroneous or clearly wrong. The ruling is clearly in the best interest of the child and is affirmed.
CONCLUSION
For the reasons stated above, we affirm. the decision of the juvenile court changing the permanent case plan in this matter from reunification with the parents to adoption. Costs in this court are assessed to M.S. to the extent permitted by La. C.C.P. 5186.
AFFIRMED.

. The child who voiced sexual abuse allegations against H.G. expressed fear of M.S. and *195 was not required to attend visitation.

. H.G. was incarcerated in Catahoula Parish for a probation violation. He did not fulfill any of his case plan goals. After his release from incarceration, authorities were not able to contact him.