Judgment rendered September 21, 2022.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 54,446-JAC

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA
IN THE INTEREST OF
K.A.S. and D.R.S.

* * * * *

Appealed from the
Eighth Judicial District Court for the
Parish of Winn, Louisiana
Trial Court No. J-3791

Honorable Anastasia S. Wiley, Judge

* * * * *

| | |
|---|---|
| WILSON & WILSON<br>By: Donald R. Wilson | Counsel for Appellants-<br>Intervenors, Larry Alan<br>Carpenter and Faith<br>Draper Carpenter |
| R. CHRISTOPHER NEVILS<br>District Attorney | Counsel for Appellee,<br>State of Louisiana |
| MATTHEW S. KELLEY<br>Assistant District Attorney | |
| LEGAL SERVICES OF NORTHWEST<br>LOUISIANA<br>By: Jacqueline C. Williams | Counsel for Appellees,<br>K.A.S. and D.R.S. |
| STATE OF LOUISIANA, DCFS<br>By: Ruby Norris Freeman | Counsel for Appellee,<br>State of Louisiana, DCFS |

OFFICE OF THE PUBLIC DEFENDER          Counsel for B.N.S.,
By:  James E. Calhoun                                 Mother

HERMAN A. CASTETE                            Counsel for T.L., Father


* * * * *


Before PITMAN, COX, THOMPSON,
HUNTER, and MARCOTTE, JJ.


HUNTER, J., dissents with written reasons.

**PITMAN, J.**

Foster parents and intervenors Larry and Faith Carpenter appeal the judgment of the trial court which held, following a permanency hearing, that a recommendation of adoption by the Louisiana Department of Children and Family Services ("DCFS") would be modified to adoption/reunification with the biological mother. For the following reasons, we reverse, modify the trial court's judgment and remand for all necessary proceedings consistent with this opinion.

## FACTS

B.N.S. is the mother of the minor children, K.A.S. and D.R.S., who are twins, born on June 1, 2016. Shortly after birth, the children were placed in the care of the DCFS. They were eventually returned to their mother in August 2018; but by September 2018, they were again placed in the custody of the DCFS. That month, the children were placed in the foster home of the Carpenters, with whom they have remained to this date. When they were placed in the home, they were two years and three months old. They are now over six years old.

The children were adjudicated in need of care in October 2018, and the DCFS prepared a case plan for services for B.N.S., which was approved by the court. B.N.S. failed to comply with the case plan and abandoned the children by failing to pay the required parental contribution. In February 2019, the DCFS filed a petition for termination of parental rights. At the termination hearing in November 2019, the children's father stipulated to the termination of his parental rights. The trial court heard testimony regarding B.N.S.'s efforts under the case plan and her failure to make the parental contributions to the children's support. It also heard testimony of her failure

to attend appointments for substance abuse evaluations and positive drug tests. The trial court concluded there was no reasonable expectation of significant improvement in her conduct in the near future, terminated her parental rights and certified the children for adoption.

B.N.S. appealed, complaining that the trial court had not considered the steps she pursued to rehabilitate herself during the time subsequent to the petition for termination of her parental rights and the time of the hearing at which her rights were terminated.

On appeal, this court determined that the trial court was clearly wrong in finding that the state proved by clear and convincing evidence that B.N.S. had failed to substantially comply with the requirements of the case plan that were necessary for the return of her children. *See State in Int. of K.A.S.*, 53,613 (La. App. 2 Cir. 9/23/20), 303 So. 3d 688. This court also found that the trial court erred in finding clear and convincing evidence that there was no reasonable expectation of significant improvement in her condition or conduct in the near future and that the trial court disregarded the rehabilitative acts that occurred after the filing of the petition to terminate parental rights. *Id.* This court reversed the trial court's judgment terminating her parental rights and remanded for a "hearing to determine whether reunification of the children with [B.N.S.] should be the goal . . . based on the evidence of her current employment status and drug treatment rehabilitation efforts." The opinion stated that the trial court shall make this determination after considering all of the evidence presented by B.N.S. and the state.

2

The case was remanded, and the child in need of care proceedings resumed. Involved in the case were B.N.S., the Winn Parish district attorney on behalf of the DCFS, the DCFS and an attorney for the children.

A new case plan was prepared by the DCFS in October 2020, which still recommended a case plan of adoption. The Carpenters filed a petition of intervention on November 2, 2020, stating that they are the children's foster parents and are interested in the disposition, case plan and permanency planning for them. B.N.S. objected to the intervention and filed a motion to limit the foster parents' involvement in the case review hearing, citing the dispositive paragraph of this court's opinion of September 23, 2020, but her motion was denied. A writ taken to this court seeking supervisory review of the denial of the motion to limit the Carpenters' involvement was denied.

The DCFS submitted a second report in November 2020 and, again, recommended a case plan of adoption, stating B.N.S. "has shown her ability to do well for short periods then revert to familiar unhealthy habits." In February 2021, the DCFS sought approval of the case plan recommending adoption. A hearing was held February 8, 2021, and a case review judgment was issued by the trial court. The judgment stated that the DCFS had made reasonable efforts to achieve permanency and reunify the family unit since the children had been placed in its custody. It also stated that the DCFS had made reasonable efforts to finalize a permanent plan of adoption for the children. After finding those facts, the trial court approved the case plan for services and approved the goal of adoption; however, it, *sua sponte*, modified the goal by adding in handwriting to the typed word **ADOPTION** "& concurrent goal of reunification." The judgment states:

[B.N.S.] tested positive for illegal substances in December 2020 and has not been compliant with mental health services with Family New Life. Although [B.N.S.] has re-enrolled in mental health services and substance abuse treatment she has not been sober for a consistent period nor has she made progress with her mental health services due to her being newly referred. [Her] hair follicle was positive for Methamphetamine and Amphetamine on December 17, 2020. [The DCFS] will continue to assess and monitor the progress of services for [B.N.S.].

The judgment also noted that B.N.S. had not successfully completed all aspects of her case plan, and it recommended that the children remain in the state's custody and that the goal of adoption be maintained until the proper provisions were made to secure permanency for them. It noted that further orders include the modified/amended case plan order with the reunification goal.

The Carpenters filed a motion for modification of the case plan and for a judicial determination that reunification as a goal was not required because B.N.S. had other children to whom her parental rights had been terminated, but the trial court would not hear evidence regarding her history with the DCFS. At the hearing on May 3, 2021, the trial court cited this court's opinion and stated that it limited the evidence presented that day to that presented by B.N.S. and the state. It concluded that the current case plan was to continue as reunification with a concurrent goal of adoption.

A permanency hearing was scheduled for June 14, 2021. The Carpenters intervened again and notified the trial court of their desire to facilitate and assist in the permanent plan for the children. The order allowing them to intervene was signed on June 14, 2021.

The DCFS filed its report in open court that date. Under the heading of "Safety and Risk Assessment," the report contains information describing

4

current threats of danger to both parents and each child's vulnerability. The DCFS stated that B.N.S. was participating in services and making progress; however, the department would require her to maintain her progress for an extended period before initiating a transition. It also stated:

> [B.N.S.] expressed experiencing night terrors and reported to taking old medication to treat the terrors. [She] should address her mental health issues with the mental health provider and successfully complete a mental health program and follow the recommendations of the provider.

In the report under the heading of "Conditions for Return to Parents' Care/Custody," the DCFS stated that B.N.S. needed to be sober and substance-free for a minimum of six months before it would transition the children. She also needed to continue her mental health treatment, maintain compliance, and be open and honest with the provider.

The permanency hearing commenced with the testimony of Kiara Chase with the DCFS, who supervises services for reunification or other permanent plans. She was assigned to this case in December 2020, at which time B.N.S. had been tested for drugs and was positive for amphetamine and methamphetamine and was referred for mental health and substance abuse services. In January 2021, her drug screen was negative, and she was referred to Horizon Rehabilitation Center ("Horizon") for substance abuse and mental health treatment. While in treatment, she was not tested by the DCFS until she went to court. In February 2021, she tested negative; but in March 2021, she tested positive for alcohol and Seroquel. She had a prescription for Seroquel, but it was an old prescription written by a provider she had not seen in over a year. Her drug tests later in March, April and May 2021 were negative. She successfully completed substance abuse services with Horizon in April 2021.

5

Chase also testified that B.N.S. was assessed and referred for counseling services. In the beginning there were issues with her cancelling appointments and not rescheduling, but it was reported by Horizon that she was participating, having missed 9 out of a total of 24 scheduled sessions. Chase stated that mental health counseling is ongoing and that there is no set time frame for completion of the services because situations arise which might require an extension of counseling.

Chase further testified that the children were placed in the home of the Carpenters and that she visits them twice a month. She stated that the children are thriving, have bonded with their foster parents and are doing very well in that setting. They had been living with the Carpenters for almost three years and had just had their fifth birthdays at the time of the hearing in June 2021. She testified that they are receiving some counseling in preparation for transitioning (to reunification) if that is the trial court's decision. She stated that she has attended visitations between B.N.S. and the children and that they seem to do well with her. She said the children do have a bond with B.N.S., albeit not a very close one; and she believed their bond with the Carpenters is stronger.

Chase also stated that there had been no changes in the situation since the last hearing in May and that the DCFS requested that the goal of adoption remain the same. She opined that B.N.S. was making progress but that the DCFS would like to see continued progress after the positive drug screen in March and wanted her to be able to continue with mental health services before starting a transition of the children.

Chase further testified that at the current time, B.N.S. is living alone in a two-bedroom, one-bathroom mobile home in Monroe. She inspected

the home and found it adequate, i.e., enough space, all utilities connected and no safety hazards. Her mother intended to help her with the children, but she now has obtained temporary employment elsewhere.

When asked about a timeline for continuing with concurrent goals and perhaps transitioning, Chase stated that the DCFS would require six months from the date of the last positive drug screen, or approximately September 2021, during which time B.N.S. should maintain sobriety and continue mental health services. She stated that if transitioning began, it would start with supervised visitation.

When questioned by the Carpenters' attorney, Chase acknowledged that the children had been with the foster family for almost three years and that this is far beyond the time frame within which the agency keeps children in foster care. However, because B.N.S. was making progress with her plan, there was a possibility that they could start a transition at some point "soon."

B.N.S.'s attorney called Dr. Kerry Scott, clinical director at Horizon, as a witness. He testified that he is a professional therapist and licensed addiction counselor but has never treated B.N.S. However, he supervised the counselors who did treat her and was familiar with her treatment, attendance and compliance. He reiterated and confirmed statements made by Chase that B.N.S. initially missed 9 out of 24 appointments. He stated that Horizon originally did not intend to provide her with any more services but that she was reinstated and has been doing well with compliance since then. He was questioned by the Carpenters' attorney regarding her mental health, and he verified that she had been diagnosed with "adjustment disorder." He stated that for some people it takes a year of treatment to be able to cope with the stresses of life and that there is a chance of recidivism.

Lacey Jordan testified that she met B.N.S. at Second Chances, a faith-based, 12-step program, and they have been friends for four months. She stated that she and B.N.S. go to the meetings frequently (3 to 4 times a week) and also attend church together.

In response to Horizon's letter regarding her missed appointments, B.N.S. testified that she tried to reschedule but was told that the computer would not "reschedule" and would only make a new appointment. Her explanation also included her inability to connect for the Zoom appointments due to a lack of internet service or that her work schedule prevented her from attending since she is working two jobs and Horizon's scheduling of appointments was never consistent. Regarding other missed sessions, she stated that at the last hearing, she provided proof through text messages that she and her counselor had been communicating with each other.

B.N.S. also testified about the coping skills that she had learned during therapy and how she would handle the situation if her children were not returned to her. She stated she would rely on her coworkers at the rehabilitation facility, her spiritual advisor and her sponsor. She reiterated that she has two jobs and works seven days a week to ensure that she has the means to care for her children; however, she has arranged to work only morning shifts if her children are returned to her. She stated her bills are paid, she has money in savings and a checking account, she has no attendance problems at work and the DCFS told her they will help her find day care for her children. Her mother, who is a radiology technician, has agreed to help her with child care.

Larry Carpenter, foster parent to the children, testified that he lives in Farmerville and is regional manager for Macs Fresh Market. He is married to Faith Carpenter, who does not work outside the home. The children had lived at their home for three years at the time of the hearing. When the children came to live with them, there were no other children in their home, but now they have two other foster children living with them—one 14 and one 16 years old. He brought "life books" with him, which are records of the children's lives since the day they arrived at the Carpenter home through the month of May 2021, the month before the hearing. The books included pictures of everyday life, as well as special occasions. The Carpenters' attorney offered the life books into evidence.

An objection of relevance was made, and the trial court stated that this was a permanency hearing and that the concurrent goals would remain in place. Because this was not the last hearing to be held in the matter, the trial court denied submission of the evidence; however, the Carpenters' attorney proffered the life books.

The trial court pointed out that they could continue the permanency hearing until the next day; but since the concurrent goal was reunification/adoption, another permanency hearing would be held at a later date. An objection was made by the Carpenters' attorney, who argued that the children had been in care for 34 months, longer than any prevailing guideline suggests the children should be in care. He argued that foster care is not a permanency goal and that this case is about the children, even if their mother is improving, and that it is unfair to keep the children in limbo for another 6-18 months. He asserted that adoption is still part of the dual goal of reunification/adoption, that the foster parents are ready to adopt if allowed

9

to do so and that they should be heard too. The trial court stated that the mother "still has rights" and then set another permanency hearing for December 6, 2021.

The Carpenters filed a motion to appeal the judgment of the permanency hearing, which continued the concurrent goal of reunification/adoption. They asked that the permanency judgment be modified to eliminate reunification as a goal. B.N.S. filed a motion to appeal and to answer the Carpenters' appeal; however, she failed to pay the appeal costs and was denied pauper status. The children have now been living with the Carpenters almost four years.

On October 28, 2021, while the matter has been pending on appeal, B.N.S. filed a motion to dismiss the appeal, which was considered by this court and referred to the merits of this appeal. After the first oral argument in this case on June 21, 2022, B.N.S. filed a peremptory exception of no right of action in this court claiming that the Carpenters have no right of action to compel a judgment determining that adoption is the most appropriate permanent plan for the children in need of care.

## DISCUSSION

*Peremptory Exception of No Right of Action*
*and Motion to Dismiss Appeal*

B.N.S. filed a peremptory exception of no right of action and claimed that the law does not grant to foster parents a right of action to petition the court to enforce a goal change to make adoption the permanent plan for the child in need of care, citing La. Ch. C. art. 1004(G). She argues that she is able to file this exception in the appellate court at any time prior to submission of the case for a decision, if proof of the ground of the exception

10

appears on the record. *Hollingsworth v. Choates*, 42,424 (La. App. 2 Cir. 8/22/07), 963 So. 2d 1089.

La. Ch. C. art. 1004(G) states as follows:

Foster parents who intend to adopt the child may petition for the termination of parental rights of the foster child's parents when, in accordance with Article 702(D), adoption is the permanent plan for the child, the child has been in state custody under the foster parent's care for seventeen of the last twenty-two months, and the department has failed to petition for such termination.

Under the circumstances of this case, the peremptory exception of no right of action is denied. B.N.S.'s parental rights to these two children were terminated by the trial court the first time in November 2019. After she appealed, this court reversed and remanded in September 2020 for further proceedings to determine if reunification should be attempted. The Carpenters were allowed to intervene in these proceedings a year later in November 2020. When the trial court modified the permanency plan to include reunification with adoption, the children had been living with the Carpenters for over three years. The Carpenters filed this appeal.

B.N.S. filed a motion to dismiss the appeal, but this court denied the motion to dismiss pursuant to La. Ch. C. art. 710, which provides that any person directly affected by a permanency plan may appeal. The motion to dismiss was referred to the merits of this appeal.

Based on the factual situation before this court, we find that the Carpenters have a right of action to appeal the permanency plan of June 14, 2021. As the children's foster parents for almost four years now, willing to adopt the children who have been in their care most of their lives, they are persons directly affected by the permanency plan reinstating reunification as a possible outcome. Proof of this exception of no right of action is not

11

apparent from the record and, thus, is denied. The motion to dismiss the appeal is also denied.

*Children in Need of Care*

The Carpenters argue that the trial court erred in affirming a permanency plan with concurrent goals of reunification and adoption and in excluding evidence arising prior to the petition for termination. They contend that the trial court considered only the rights of the mother when taking new evidence regarding reunification and ignored that the concurrent goal of adoption might still be in the best interest of the children despite the progress the mother has made since 2018.

B.N.S. filed an answer to the appeal on November 15, 2021, and claimed that the judgment was in contravention of this court's order in the first appeal. She argues that this court should order that the proper goal is reunification and that the state's case should be dismissed and the children returned to her. She contends that the instructions from this court were to hold a hearing determining whether reunification should be the goal of the hearing and that only her evidence and that of the state should be considered.

The health, safety and best interest of the child is the paramount concern in all child in need of care proceedings. La. Ch. C. art. 601; *State in Int. of Z.P.*, 52,354 (La. App. 2 Cir. 9/26/18), 255 So. 3d 727. To reverse a trial court's permanency plan determination, an appellate court must find from the record that the trial court's finding is clearly wrong or manifestly erroneous. *State in Int. of C.S.*, 49,955 (La. App. 2 Cir. 3/18/15), 163 So. 3d 193.

More than simply protecting parental rights, our judicial system is required to protect the children's rights to thrive and survive. *State in Int. of*

12

*S.M.*, 98-0922 (La. 10/20/98), 719 So. 2d 445; *State in Int. of C.S.*, *supra*. A child has an interest in the termination of rights that prevent adoption and inhibit that child's establishment of secure, stable, long-term, continuous family relationships. *State in the Int. of S.M.*, *supra*. Children need permanency and stability and forcing them to remain in foster care indefinitely, when there is no hope of reunification, runs afoul of state and federal mandates to further the best interests of the child. *State in Int. of Z.P.*, *supra*. While the interest of a parent is protected in a termination proceeding by enforcing the procedural rules enacted to ensure that parental rights are not thoughtlessly severed, those interests must ultimately yield to the paramount best interest of the children. *State in Int. of C.S.*, *supra*.

While adults can take years to improve their functioning, children are not granted the same amount of time, and their lives are significantly disrupted while the parents are attempting to deal with their own problems. *State in Int. of C.F.*, 17-1054 (La. 12/6/17), 235 So. 3d 1066. That children have a need for permanency is well established in the jurisprudence, and it is not the intent of either state or federal law that children remain in foster care permanently. *State in Int. of P.B.*, 49,668 (La. App. 2 Cir. 12/17/14), 154 So. 3d 806. Thus, the length of time a child has been forced to remain in foster care is a factor the courts consider in the termination of parental rights decision. *Id.*

*Permanency Hearing, the Evidence,*
*and Possible Dispositions*

La. Ch. C. art. 702 concerns permanency hearings and states, in pertinent part, as follows:

> B. The court shall conduct a permanency hearing within
> nine months after the disposition hearing if the child was

removed prior to disposition or within twelve months if the child was removed at disposition, but in no case more than twelve months after the removal. Permanency reviews shall continue to be held at least once every twelve months thereafter until the child is permanently placed or earlier upon motion of a party for good cause shown or on the court's own motion.

C. The court shall determine the permanent plan for the child that is most appropriate and in the best interest of the child in accordance with the following priorities of placement:

> (1) Return the child to the legal custody of the parents within a specified time period consistent with the child's age and need for a safe and permanent home. In order for reunification to remain as the permanent plan for the child, the parent must be complying with the case plan and making significant measurable progress toward achieving its goals and correcting the conditions requiring the child to be in care.

> (2) Adoption.

* * *

D. (2)(a) In the case of a child under the age of six, the court may find that continuation of the child's placement with the current caregiver is in the child's best interest if the child is in a stable home environment where the child's physical and emotional needs are met by a person who has a significant relationship with the child, that no relative or other suitable caregiver has been identified as a concurrent plan caregiver as part of the child's case plan or report submitted to the court, and that it would be detrimental to the child's well-being if the child is removed from the current caregiver. Upon such finding, the department shall not make any change in placement absent prior written notice to the court.

* * *

(c) For the purposes of Subsubparagraph (a) of this Subparagraph, a foster parent, relative, or other suitable individual with whom a child under the age of six has resided continuously for nine months or more is a person who has a significant relationship with the child. Nothing in this Subparagraph shall be construed to interfere with any rights afforded to biological parents.

The comments to this code article from 1991 state that Paragraph B provides for discretionary hearings when a child has been placed in long-term foster care or in an adoptive home. The comments from 1999 state that termination of parental rights proceedings must be initiated for any child who has been in care for 15 of the last 22 months. Comments from 1999 to La. Ch. C. art. 675 reiterate that termination of parental rights is warranted when the child has been in foster care for 15 of the last 22 months.

La. Ch. C. art. 672.1 concerns reunification efforts determinations and states, in part:

> A. At any time in a child in need of care proceeding when a child is in the custody of the department, the department may file a motion for a judicial determination that efforts to reunify the parent and child are not required.
>
> B. The department shall have the burden of demonstrating by clear and convincing evidence that reunification efforts are not required, considering the health and safety of the child and the child's need for permanency.
>
> C. Efforts to reunify the parent and child are not required if a court of competent jurisdiction has determined that:
>
> * * *
>
> (4) The parental rights of the parent to a sibling have been terminated involuntarily.

Whether a parent has complied with a case plan, the expected success of rehabilitation and the expectation of significant improvement in the parent's condition or conduct are all findings of fact reviewed under the manifest error standard. *State in Int. of R.W.H.V.*, 53,065 (La. App. 2 Cir. 9/25/19), 281 So. 3d 800. To reverse a trial court's permanency plan determination, an appellate court must find from the record that the trial court's finding is clearly wrong or manifestly erroneous. *Id.* A child has an interest in the termination of rights that prevent adoption and inhibit that

15

child's establishment of secure, stable, long-term, continuous family relationships. *Id*. The court is required to determine the permanent plan for the child that is most appropriate and in the best interest of the child. *Id*., *citing* La. Ch. C. art. 702(C). The placement priorities include reunification, or the return of the child to the legal custody of the parents within a specified time period consistent with the child's age and need for a safe and permanent home, and adoption. *Id*. In order for reunification to remain the permanent plan for the child, the parent must be complying with the case plan and making significant measurable progress toward achieving its goals and correcting the conditions requiring the child to be in need of care. *Id*., *citing* La. Ch. C. art. 702(C)(1). Mere cooperation by a parent is not the sole focus of the evaluation of a permanency plan. *Id*. Rather, the courts must assess whether the parent has exhibited reformation, which is shown by "significant, substantial indication of reformation . . . such as altering or modifying in a significant way the behavior which served as a basis for the State's removal of a child from the home." *Id*., *quoting State in Int. of S.M.*, *supra*.

In the case at bar, B.N.S.'s parental rights to these children had previously been terminated by the trial court, and this court reversed and remanded with instructions to consider evidence of her progress after the petition for termination. Due to these instructions, the trial court recommended a modification of the case goal from adoption to adoption/reunification. Further, the trial court chose only to accept evidence related to the biological mother's efforts to rehabilitate herself and did not consider any evidence regarding the best interest of the children, which is the paramount concern in Children in Need of Care proceedings. At the time of the hearing, the DCFS still considered

16

adoption as the preferred placement and was reluctant to proceed with reunification. In fact, the DCFS stated it would not consider reunification unless B.N.S. maintained sobriety and met the requirements of the plan for six more months. Unfortunately, the result of the remand by this court was an even further delay in the permanent placement of these children, who have now been in foster care most of their lives.

The DCFS has repeatedly suggested to the trial court that reunification at the time of the hearings was not recommended because B.N.S., even though she made progress, continued to have problems with her mental health and substance abuse issues. She has been diagnosed with adjustment disorder and requires ongoing care as necessary to deal with the stresses in life. She missed various appointments with her counselors and had relapsed. She has failed since 2018 to satisfy her case plan. Although she has made efforts to get her life in order, her children have been living, growing and thriving in the home of the Carpenters, who are the only parents they have known since they were two years old. They are now over six years old. The Carpenters have provided the children with a stable home environment where their physical and emotional needs are met. They have the significant relationship with the children envisioned by La. Ch. C. art. 702(D)(2)(a), and it would be detrimental to the children's well-being if they are removed from their current caregivers.

For the foregoing reasons, we find the modification of the case goal from adoption to adoption/reunification to be manifestly erroneous. The well-being and best interest of the children should not be subservient to the mother's parental rights. The judgment maintaining the case goal as adoption/reunification has erroneously and egregiously prolonged the tenure

17

of these children in foster care.  The best interest of the children is not served by the continual allowance of time for the mother to make progress in her life choices.

This assignment of error has merit.

*The "Life Books" Evidence*

The Carpenters argue that the trial court erred in excluding the children's life books as evidence when the goal still included adoption as an option for permanent placement of the children.  The trial court interpreted this court's ruling on remand and limited the evidence presented on the date of the hearing to B.N.S.'s progress.  When the Carpenters attempted to enter the life books that memorialized the children's lives from the ages of two to five years, B.N.S.'s attorney objected on the grounds of relevance, and that objection was sustained.  The trial court stated that B.N.S. "still has rights."  The trial court allowed the life books to be proferred and stated that there would be another permanency hearing at a later date.

La. C.E. art. 401 defines relevant evidence as evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence.  La. C.E. art. 402 states that all relevant evidence is admissible, except as otherwise provided by law.

The children's life books are relevant and admissible evidence when the paramount goal of the proceeding is a determination of their best interest.  Adoption is one of the goals, and the life books are evidence of the suitability of the Carpenters' home and their willingness to adopt the children.  For these reasons, the life books should be entered into evidence and considered in the next permanency hearing.

18

This assignment of error has merit.

## CONCLUSION

For the foregoing reasons, the judgment of the trial court modifying the case plan goal to a dual goal of adoption/reunification is hereby reversed and modified to that of a permanency plan of termination/adoption. The matter is remanded for a termination trial with all relevant evidence to be presented. These proceedings are to be held expeditiously as the children have already been in foster care much longer than is appropriate. Costs of this appeal are assessed against B.N.S.

**JUDGMENT REVERSED AND MODIFIED; MATTER REMANDED FOR FURTHER PROCEEDINGS, WITH INSTRUCTIONS**.

**HUNTER, J., dissenting.**

In balancing the best interests of the children with the interest of BNS to be reunited with her children, I conclude the trial court's judgment correctly maintains reunification as a goal of the permanent case plan.

As stated by the DCFS witness at the permanency review hearing, BNS has completed a substance abuse treatment program, maintained employment and established a home suitable for her minor children. DCFS has identified the mother's addiction and mental health issues as the primary impediments to starting the transition of the children to her care. At the permanency plan review in June 2021, the director of the Horizon Rehab Center, Dr. Scott, testified BNS has been diagnosed with "adjustment disorder," which he defined as an inability to cope with stressors that occur in a person's life. Dr. Scott stated adjustment disorder is treatable with counseling.

As noted in the majority opinion, La. Ch.C. art. 702 provides the return of a child to the legal custody of the parent is the first priority of placement in the trial court's determination of a permanent plan when consistent with the child's need for a safe and permanent home. The test established to determine if a parent has shown sufficient reformation to preserve family reunification and prevent termination of parental rights is "reasonable expectation of reformation," which exists when a parent has cooperated with state officials and has shown improvement, although all problems which exist have not been eliminated. *State in Interest of J.B. v. J.B., Jr.*, 35,846 (La. App. 2 Cir. 2/27/02), 811 So.2d 179. Reformation is shown by modifying in a significant way the behavior which was the basis for the child's removal from the home. *State in Interest of J.B., supra.*

1

In this type of proceeding, the court must carefully balance the best interest of the children with the interest of the parent. A parent has a natural, fundamental liberty interest in the continuing companionship, care and custody of her children. However, the children have a profound interest in terminating parental rights which inhibit the establishment of a secure and stable environment found in a home with proper parental care. *State ex rel. J.M.*, 02-2089 (La. 1/28/03), 837 So. 2d 1247.

In this case, appellants assert in their brief that if the mother is given time to obtain mental health counseling, the children will continue to "languish" in foster care. However, this assertion is not necessarily accurate because the children could begin to transition through supervised visitation with their mother while she continued receiving mental health counseling.

The DCFS prepared a permanency report finding that the mother "is participating in services and making progress; however, the Agency would like to see BNS maintain progress for an extended period of time before initiating a transition. . . . BNS needs to be sober and substance free for a minimum of six months before the Agency will transition the children" to their mother's home. The report further finds BNS needs to continue mental health treatment and maintain compliance. The record demonstrates that the mother, with some setbacks, is continuing her efforts to address these mental health issues, which often require long-term treatment to achieve improvement in the person's condition.

During this interim period, BNS has had an opportunity to show she is serious about her commitment to staying sober and obtaining mental health counseling to be able to properly care for her children. The trial court will

need to assess whether the evidence demonstrates the mother is sincerely seeking treatment of her mental health issues.

Based upon this record, I cannot say the trial court's judgment maintaining reunification as a goal of the case plan is inconsistent with the best interests of the children. Consequently, I would affirm the judgment. However, I agree that upon remand, it is important for the trial court to hear any relevant evidence from all of the interested parties in determining a permanent plan for the future of these children. Such an evidentiary review should include, along with consideration of the "life books," the trial court's evaluation of any impact to the interests of KAS and DRS caused by the addition of two older foster children to the home of the foster parents.