CARAWAY, J.
hJ-H. was removed from his mother’s custody and adjudicated a child in need of care under Louisiana law after his mother, B.H., was pulled over for travelling over 100 miles per hour on the interstate while he, an infant less than a year old, was unrestrained in the car. While B.H. was serving prison time for charges related to the use of the car, she agreed to a case *1003 plan presented by the Louisiana Department of Children and Family Services (“DCFS”). Almost two years passed between the implementation of the plan and the hearing on the DCFS petition to terminate the parental rights of J.H.’s mother. During that time, B.H. failed multiple drug tests, failed to maintain a stable residence, and was noncompliant with the treatments for her mental health issues. Following a hearing on the petition, the juvenile court found that the State had met its burden of producing clear and convincing evidence of a lack of substantial compliance with the case plan, that there was not a substantial chance of improvement in the immediate future, and that termination was in the best interest of the child.

Facts

J.H. is a three-year-old boy who tested positive for marijuana when he was born, and was thus designated a “drug-exposed newborn” by the State when they were notified on August 8, 2013. A case was opened, but DCFS and the authorities were unable to locate J.H. and his mother, B.H., so the case was discontinued. J.H.’s biological father is unknown. J.H.’s foster mother believes he suffers from Fetal Alcohol Syndrome, and B.H. has admitted to consuming alcohol while she was pregnant. J.H. suffers from certain developmental delays including a very limited vocabulary, delays in | {.sitting and walking, and a leg that turns in causing him to walk on his toes and have low muscle tone. J.H. entered into the custody of his foster mother, Sonja Elmore, at the age of 9 months. While in the custody of his foster mother, J.H. has been enrolled in occupational, physical, and speech therapy programs.
On February 7, 2014, when J.H. was approximately 6 months old, he was brought into the hospital by his mother and her boyfriend for a respiratory virus infection. While at the hospital, B.H. and her boyfriend were arrested for allegedly stealing a wallet. B.H. was later released from those charges, but when asked whether she could pass a drug test at that time, B.H. responded that she could not. As a result of the incident, DCFS took custody of the child on February 10, 2014. At the later continued custody hearing, J.H. was returned to his mother’s custody, and B.H. was ordered to work with DCFS. At DCFS’s bequest, B.H. was supposed to enter an inpatient treatment facility for her substance abuse problems on April 3, 2014. However, on April 4, 2014, it was reported to DCFS that B.H. had fled out of a window of her home with J.H. to avoid going to the treatment facility. Although it was unknown at the time, B.H. took a Greyhound bus with J.H. to Tulsa, Oklahoma, to flee to her boyfriend, Gregory Johnson.
On April 9, 2014, J.H. entered into DCFS custody when an instanter order was issued by the Monroe City Court. The order was granted after B.H. was arrested after being pulled over for travelling over 100 miles per hour in a stolen car with J.H, unrestrained. This occurred as she was returning from Tulsa. B.H. stated that she was trying to feed J.H. and did |3not realize how fast she was going. She also stated that the car was her boyfriend’s and that he had reported it. stolen because he was angry that she was not answering her phone.
Later, on May 8, 2014, while B.H. was still in jail, the State filed a petition to have J.H. declared a “child in need of care” (“CINC”) under the Louisiana Children’s Code. A Family Team Conference including DCFS and B.H. was held ,on May 16, 2014, to outline the steps B.H. needed to take and identifying the goal of the case plan as reunification. On June 8, 2014, an adjudication order was entered by the Monroe City Court finding J.H. a *1004 CINC and continuing his custody with DCFS and his foster mother.
On September 9, 2014, B.H. pleaded guilty to the charge of unauthorized use of a motor vehicle and her understanding was that all other charges stemming from the speeding incident were dismissed. She was released from jail on September 12, 2014, and returned to living with her mother at 3300 Lee Avenue, Monroe, LA. DCFS and B.H. then began to work together to attempt to complete her case plan and restore custody of her child to her. To begin the substance abuse treatment portion of her case plan, B.H. was referred to the Monroe Office of Behavioral Health on September 29, 2014, to begin random drug screens, undergo a substance abuse assessment, and begin drug classes. Her urine test was negative on that day. Subsequent urine screens on October 20, 27, and 29, November 3, 10, 12, 13, and 24, and December 1 and 15,2014, were all negative for any illegal drugs. On November 21, 2014, an updated case plan was reviewed at a Family Team Conference between DCFS and B.H., and B.H.’s progress toward reunification with J.H. was noted.
|4B.H. was referred to the Monroe Office of Behavioral Health on December 12, 2014, for a mental health assessment to begin completing the mental health portion of her case plan. The assessment did not result in any recommendation, but B.H. did admit that she had not taken any medication for her diagnosed bipolar disorder for more than a year. She completed the parenting classes required by the day-to-day portion of her case plan with Tamara Thompson at River City Counseling Professionals on December 17, 2014. On December 19, 2014, B.H. underwent a domestic violence assessment at Wellspring in Monroe which resulted in a finding that no services needed to be offered. On December 31, 2014, B.H. completed her drug classes at the Office of Behavioral Health. At that time she either volunteered or was asked to attend the office’s Continuing Care classes for substance abuse. The Continuing Care classes were scheduled to begin in January, and B.H. agreed to attend.
DCFS attempted to conduct a home-study at 3300 Lee Avenue, B.H.’s residence, on January 21, 2015, with the goal of potentially allowing B.H.’s mother to have custody of J.H. while B.H. finished her case plan. B.H. at first refused to allow DCFS personnel to look inside the refrigerator, and when she did, they discovered there was no food. At some point during the home study process, DCFS discovered that B.H.’s mother had an outstanding warrant for disturbing the peace. B.H. and her mother stated that they would reconcile the matter, but there is no indication that it was ever taken care of. On March 3, 2015, DCFS was made aware that B.H. was not attending the Continuing Care classes that she had either volunteered for or been told to attend. B.H. was asked to submit to a urine drug test and a |shair follicle test on March 18, 2015. The urine screen was negative for any illegal drugs; however, the hair follicle test came back showing positive results for cocaine. Due to this positive test, B.H. was referred to the Office of Behavioral Health again.
On March 3, 2015, B.H. underwent a psychological evaluation with Dr. James Pinkston, a clinical psychologist in Shreveport, at the direction of DCFS. After performing multiple tests and a personal interview, Dr. Pinkston wrote a report indicating his findings and the various diagnoses that B.H. reported to him including alcohol, PCP, and marijuana abuse, with PCP being her “drug of choice” in the past. B.H. went to an appointment with a Dr. Agarwal on April 10, 2015, where she was prescribed a 30- *1005 day supply of 3 medications: Seroquel, Trazodone, and Wellbutrin.
On May 21, 2015, B.H. underwent a urine drug test that returned negative results, but on June 11, 2015, B.H. did a hair follicle drug test that returned a positive result for cocaine. As a result, B.H. was again referred to River City Counseling Professionals on June 30, 2015, for a substance abuse assessment, but her urine screen on that day showed negative results. After this flurry of testing and assessments, the State made a motion for a permanency healing and on July 21, 2015, the Monroe City Court entered a permanency judgment which continued the custody of J.H. with DCFS and his foster mother and approved changing the goal of the case plan from reunification to adoption.
Following the change to the case plan, B.H., at the urging of DCFS, made an appointment to return to Dr. Agarwal for a follow-up and to refill her prescriptions on September 18, 2015. B.H. had not refilled her 30-day | ¿prescriptions since April of 2015, but stated that she “had plenty of medication left.” She also complained that the medication made her sleepy and that she could focus better without it. B.H. went to the appointment and was given new prescriptions by Dr. Agarwal, this time only for Seroquel and Trazodone. On October 12, 2014, B.H. underwent another hair follicle test which again returned positive results for cocaine.
On October 19, 2015, the State filed a petition for the involuntary termination of the parental rights of B.H., the alleged father, and/or any other putative father. The petition alleged that B.H. had not substantially complied with the housing, mental health, substance abuse, and day-to-day parenting portions of her case plan, particularly noting the three positive hair follicle drug tests. The attorney for the child, J.H., joined in the recommendation that the parental rights be terminated.
B.H. was scheduled to take another drug test before the trial on the termination of her parental rights on January 6, 2016. Due to an alleged clerical error, the screening facility did not receive the paperwork for a hair follicle test, and only a urine test which returned negative results was conducted. Upon being made aware of the error, DCFS contacted B.H. to request that she submit to another screening on January 11, 2016. B.H. refused to go back for another screening at that time.
On January 26, 2016, a trial began on the involuntary termination of B.H.’s parental rights. Due to the length of the testimony, the trial was continued until and completed on February 3, 2016. In the time between those dates, B.H. went for another hair follicle test and, although the results were not available until after the close of the trial, the eventual result was a |7“no finding” — neither a positive or negative result — because the sample was insufficient. During the course of the trial, testimony was offered from multiple witnesses that was largely consistent with the above described sequence of events.
Ms. Tamara Thompson, a family therapist and the leader of B.H.’s parenting classes, testified first. Her testimony was that B.H. attended and completed her parenting classes, but that she had to do individualized lessons for B.H. to accomplish that. In addition, Ms. Thompson noted some concerns with B.H.’s ability to utilize the skills taught, although B.H. was a highly motivated and eager individual. During her classes, B.H. was informed that parents need to comply with the complete case plan agreed upon with DCFS in order to regain custody of a child,
Ms. Sonya Elmore, the foster parent of J.H. since he entered DCFS custody, was *1006 second to testify. Her testimony made clear that B.H. expressed love and affection for J.H., but that she had instances where it appeared that her parenting skills were not sufficient. An example referred to was when a visit was arranged at a McDonald’s restaurant and B.H. ordered a disproportionate amount of food for her young child. Ms. Elmore also stated that J.H. has been diagnosed with Fetal Alcohol Syndrome by two different doctors. She noted that J.H. has certain developmental delays including speech and mobility problems and that she takes him to occupational therapists and physical therapists throughout the week as well as having him enrolled in the Early Steps learning program.
B.H. also took the stand during the trial. B.H. testified that she agreed to the original case plan while she was still in jail. Later case plans which | ¿were revised and updated were agreed to by B.H. in October of 2014, and April and October of 2015. Explaining her living situation, B.H. stated that she now lived with her mother at 120 Egan Street, but before that at 2706 Lee Avenue. Other addresses which were given as B.H.’s residence during the period that the case plan was being implemented included 903 South 2nd Street, which she claimed was her boyfriend’s house, 3300 Lee Avenue, the address she moved into with her mother after being released from jail, and 711 Plum Street, a friend’s house. B.H. testified that she would not allow a home inspection to be done around October of 2015 at the Egan Street address because they had only been in the home a few months and had yet to have it furnished.
Regarding her mental health issues, B.H. testified that, although she was diagnosed bipolar at age 11, she chose not to take her medications for the prior 3 months because she could focus better when not taking them. She stated that she knew the plan required her to take the medications prescribed, but that she worried she would not be able to take care of a child if she took them. B.H. could not explain how there were three positive hair follicle tests showing cocaine use and stated that she had never used cocaine. She also identified that all of her urine tests had come back negative, both those given by DCFS and those required by her probation officer.
Dr. James Pinkston testified as an expert in the field of clinical psychology and gave his opinion stemming from his interview with B.H. on March 3, 2015. He stated that she was referred to him by DCFS for a psychological evaluation regarding her ability to parent a child. His evaluation yielded a finding that B.H.’s mental status was largely functional |nwith some impairments in her judgment and insight. Dr. Pinkston’s evaluation was that, although no single one of B.H.’s behaviors caused him to find her an unfit parent, her pattern of behaviors and the constellation of symptoms she exhibited would cause him great concern regarding her ability to appropriately make wise choices in caring for J.H. Noting that positive drug tests would increase his level of concern regarding B.H.’s parenting abilities, he rendered a professional opinion that B.H. did not understand the severity of her poor choices and the associated risks, making her incapable of independently parenting her young child, but he also noted that she would make a great choice as a supportive parent with liberal amounts of time to spend with the child. On cross-examination, Dr. Pink-ston clarified that he did not think it was inappropriate for B.H. to visit with the child and that he would not recommend that her parental rights be terminated.
Ms. Takia Boyette, the case worker in charge of J.H. and B.H.’s case, also testi- *1007 fled at the hearings. Her testimony was that all provisions of the case plan, including the possible termination of parental rights for noncompliance with the plan, were discussed and agreed upon by all parties on multiple occasions. B.H. gave Ms. Boyette at least 5 different addresses of residence while the case plan was in place and did not allow home studies as requested at various times. Ms. Boyette also testified to B.H.’s failure to take her medication for her mental health issues and unwillingness or inability to return to follow up appointments to refill prescriptions. Addressing B.H.’s substance abuse issues, Ms. Boyette testified that all urine tests were negative, but hair follicle tests in March, June, and October |1(tof 2015 returned positive results for cocaine. Ms. Boyette’s conclusion was that B.H. had not been compliant with her case plan.
At the close of the trial, all parties were given time to file post-trial briefs and the record was left open for the admission of the results of the drug test which was underway. DCFS filed a brief on February 17, 2016, and a brief was filed on behalf of J.H. on March 2, 2016. No brief was filed on behalf of B.H. despite her request to file through her attorney. On March 31, 2016, the court received a regular DCFS report on J.H.’s case which indicated that B.H. underwent another hair follicle test around March 23, 2016, and the results had come back as positive for cocaine, marijuana, and PCP. Deeming the matter ripe for judgment, the court issued its reasons for judgment on April 7, 2016, and a judgment terminating parental rights on April 12, 2016. The reasons indicated that the State had satisfied its burden of showing by clear and convincing evidence the grounds for La. Ch.C. art. 1015(5) and that B.H. had not substantially complied with her case plan. The three areas of particular concern indicated by the court were that she did not remain drug free, she had not maintained a stable home, and she was not compliant with her mental health medications. In addition to terminating the parental rights of J.H.’s parents, the judgment freed J.H. for adoption.[1]

Discussion

Appellate courts review a trial court’s findings as to whether parental rights should be terminated according to the manifest error standard. State ex rel. K.G., 02-2886 (La. 3/18/03), 841 So.2d 759, 762. The manifest error h ¶ standard requires the appellate court to determine whether the record reflects that the trial court was clearly wrong. State in the Interest of H.A.B., 10-1111 (La. 10/19/10), 49 So.3d 345, 368. The Louisiana Supreme Court has indicated that the unique circumstances of a proceeding for the involuntary termination of parental rights require the court to consider both the private interest of the parent in parenting his or her child and the private interest of the child in establishing a relationship and proper care. State ex rel. H.A.S., 10-1529 (La. 11/30/2010), 52 So.3d 852, 859. However, the interest of the child is considered paramount and must be considered over that of the parent. Id. Involuntary termination proceedings must determine whether it is in the best interest of the child to sever all legal relations, not whether the parent should be deprived of custody of the child. Id.
It is well established that, under Title X of the Children’s Code, the parental rights of an individual may be involuntarily terminated upon a showing of one of the statutory grounds found at La. Ch.C. art. *1008 1015. In addition to finding that a statutory ground has been proven, the judge must also find that termination is in the best interest of the child under La. Ch.C. art. 1039. The State bears the burden of proving the elements of one of the statutory grounds by clear and convincing evidence. La. Ch.C. art. 1035(A).
In this case, DCFS sought to have B.H.’s parental rights terminated under La. Ch.C. art. 1015(5), which states:
Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent’s custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no 1 ^reasonable expectation of significant improvement in the parent’s condition or conduct in the near future, considering the child’s age and his need for a safe, stable, and permanent home.
The enumerated elements of this subsection require: (1) at least a year has passed since the child was removed from the parent; (2) no substantial compliance with the approved case plan; and (3) lack of any reasonable expectation of significant improvement in the parent’s conduct in the near future.
The first element has been satisfied as approximately eighteen months passed between the initial instanter order of April 9, 2014, and the State’s filing of the motion for involuntary termination of parental rights on October 19, 2015.
The second element, lack of substantial compliance with the case plan, is the topic of the most heated debate in this case. According to La. Ch.C. art. 1036(C), lack of substantial compliance with the case plan can be shown by one or more of seven circumstances, four of which are relevant here. Those circumstances include:
(3) The parent’s failure to keep the department apprised of the parent’s whereabouts and significant changes affecting the parent’s ability to comply with the case plan for services.
(5) The parent’s repeated failure to comply with the required program of treatment and rehabilitation services provided in the case plan.
(6) The parent’s lack of substantial improvement in redressing the problems preventing reunification.
(7) The persistence of conditions that led to removal or similar potentially harmful conditions.
La. Ch.C. art. 1036(C).
| i3The third element of La. Ch.C. art 1015(5) requires the lack of any reasonable expectation of significant improvement in the parent’s conduct in the near future and is explained in La. Ch.C. art. 1036(D) as being shown by one or more of:
(1) Any physical or mental illness, mental deficiency, substance abuse, or chemical dependency that renders the parent unable or incapable of exercising parental responsibilities without exposing the child to a substantial risk of serious harm, based upon expert opinion or based upon an established pattern of behavior.
[[Image here]]
(3) Any other condition or conduct that reasonably indicates that the parent is unable or unwilling to provide an adequate permanent home for the child, based upon expert opinion or based upon an established pattern of behavior.
La. Ch.C. art. 1036(D).
The Louisiana Supreme Court has determined that “a mental deficiency related to the parenting ability is relevant in de *1009 termining the role of the mother in abuse or neglect of the children,” but mental illness alone does not warrant termination of parental rights. State ex rel. C.J.K., 2000-2375 (La. 11/28/00), 774 So.2d 107, 115 (citing State in the Interest of J.A., 99-2905 (La. 1/12/00), 752 So.2d 806, 814). Further, we are admonished that the impairment must expose the child to a substantial risk of harm, and that risk must be substantiated by expert testimony or by a pattern of risk to the child from the parent’s acts or omissions. State ex rel. H.A.S., supra at 861.
In the petition for termination of parental rights and the trial court’s reasons for judgment, multiple failures to substantially comply with the case plan were noted, with the most dominant being the failed drug tests and the | ulack of compliance with taking medication for mental health. B.H.’s appeal appears to focus primarily on whether the evidence presented regarding the drug tests satisfies the clear and convincing standard required of the State. We find that the evidence presented was sufficient to meet that burden.
As explained by the above testimony, B.H. tested positive for cocaine on several occasions, but the only positive tests were hair follicle tests. The record indicates that the trial court attempted to resolve this issue by ordering another drug screen done after the first day of the hearing with an additional sample to be taken to provide an opportunity for B.H. to secure an independent analysis. According to the State, only one sample was taken and analyzed because the testing lab was only paid for one test and would not take a second sample without payment from B.H. Appellant asserts that this is not a reasonable explanation and that the failure to take two samples adversely affected the fairness of the case. However, appellant does not explain how this is unreasonable or why she did not procure her own test. Appellant also does not offer any explanation to challenge the positive results other than comparing them to the negative urine tests. We find that the State acted reasonably in paying for its test as required by the Court, and that B.H. had ample opportunity to secure her own independent test. In addition, the court does not find that the trial court committed manifest error when it determined that the multiple failed hair follicle tests were clear and convincing evidence of B.H.’s failure to substantially comply with the case plan.
Aside from the drug screen issue, and unchallenged in the appellant’s brief, the trial court found an additional lack of substantial compliance with |isthe case plan when B.H. failed to keep DCFS apprised of her adequate and stable housing and failed to adhere to the treatment plans for her mental health. The judgment specifically notes seven residences in two years and a failure to comply with mental health medications. These two findings alone, supported by clear and convincing evidence, satisfy the second element of La. Ch.C. art. 1015(5).
The third element required for termination of parental rights, lack of any reasonable expectation of significant improvement in the parent’s conduct in the near future, has been shown by the expert testimony of Dr. Pinkston. His testimony specifically stated that, without her medication, there was a strong likelihood of reoccurrence of depression and/or mania, and such an episode could potentially harm the child. In fact, Dr. Pinkston stated that even if J.H. were entirely healthy and did not have any special needs, he would “still have serious concerns about her ability to consistently provide an appropriate and safe environment for him.” His expert testimony clearly indicates that B.H. cannot independently parent her child without *1010 creating a substantial risk of harm, and no other expert testimony, is offered to rebut that statement.
This case is notably different from that addressed by the Louisiana Supreme Court in State ex rel. H.A.S. wherein the Court was not convinced that there had been a showing that termination of parental rights was in the best interests of the child or that there was no reasonable expectation of significant improvement in the future. State ex rel. H.A.S., supra at 862, As a result, the Court remanded the case for a new hearing nine months later. Id. The main reason for the new hearing was that the only mental health | ^examination had occurred more than two years before the hearing, and thus the doctor’s opinion was not persuasive about the prospects of improvement. Id. at 861. In addition, the parent in State ex rel. H.A.S. had not tested positive for illegal drugs for almost two years before the ruling, and the attorney for the child sided with maintaining the goal of reunification. In contrast, in this case B.H. has tested positive for drugs up to and after the hearing, was examined and prescribed medication just months before the hearing, and was not joined by the attorney for the child. There are Clear differences between the case cited by the appellant and the facts of the case before us.
The evidence presented at the hearing was clearly sufficient to satisfy the burden of showing that more than a year had passed before the motion to terminate parental rights, despite numerous chances B.H. failed at complying with fundamental provisions of her plan, and expert testimony did not forecast a significant chance, of change in the near future. In addition, we are convinced that termination would be in the best interest of the child as evidenced by the testimony of Dr. Pinkston and the planned adoption of J.H. by his foster mother.

Conclusion

Accordingly, we affirm the trial court’s judgment. Costs of this appeal are assessed to appellant.
AFFIRMED.

. Ms. Sonya Elmore, J.H.’s current foster parent, has testified that she wants to adopt J.H., and DCFS representatives have indicated that they intend for J.H. to be adopted by Ms. Elmore if B.H.’s parental rights are terminated.