Judgment rendered August 28, 2024.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 55,933-JAC

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA
IN THE INTEREST OF
S.S. and K.S.

* * * * *

Appealed from the
Forty-Second Judicial District Court for the
Parish of DeSoto, Louisiana
Trial Court No. JD-4819

Honorable Amy Burford McCartney, Judge

* * * * *

HENRY GOODRICH, JR.      Counsel for Appellant,
     T.S., Father

MINIFIELD & HARPER
By: Pamela R. Harper

EDWIN L. BLEWER, III      Counsel for Appellee,
PAMELA R. MOSER      State of Louisiana
Assistant District Attorneys

PUBLIC DEFENDERS OFFICE      Counsel for Appellee,
By: Angela G. Waltman      A.M., Mother

ACADIANA LEGAL SERVICES      Counsel for Appellees,
CORPORATION      S.S. and K.S., Children
By: Danika A. Benjamin

* * * * *

Before PITMAN, STONE, and THOMPSON, JJ.

**THOMPSON, J.**

Two young children were deemed children in need of care, removed from their mother and father, and placed with foster parents under the direction of the Department of Children and Family Services. During the two years that followed, there continued to be serious challenges regarding the emotional and mental well-being of the children and their related behavior. Ultimately, the trial court modified the permanency plan for the children from reunification with their parents to a plan for their adoption. The mother failed to progress. The father, who has a violent criminal history, has made only modest progress on important areas of needed improvement and was determined to be a negative influence on the behavior of the children. He appeals the trial court ruling maintaining the goal of adoption rather than reunification and appeals the trial court maintaining the suspension of his visitation with the children. For the reasons more fully detailed below, we affirm the ruling of the trial court.

## FACTS AND PROCEUDRAL HISTORY

On December 28, 2021, the Department of Children and Family Services (hereinafter, "DCFS") removed the children, S.S. (DOB: 7/3/2012) and K.S.,[1] also known as M.S. (DOB: 7/26/18) (hereinafter, "M.S."), from the home of T.S., their biological father. The incident giving rise to this removal involved T.S. bringing his daughter, S.S. (age nine at the time, currently age 12), to receive medical attention, and T.S. insisting that S.S. had been raped by her grandfather and a deceased uncle. Law enforcement

---

[1] K.S. is more frequently referred to in the record as "M.S." Soon before the children were removed from T.S.'s custody, T.S. legally changed the child's name. Pursuant to a paternity test that determined T.S. was the child's biological father, the child's name was legally changed.

observed T.S. behaving erratically and arguably in a psychotic manner while he made this report, and he appeared to be under the influence of substances, which were later determined to be methamphetamine. S.S. denied that anyone hurt her, but she did advise law enforcement there had not been water or electricity at T.S.'s house for weeks. S.S. also reported there was little food in the house, and her mother was living in Arkansas. At this time, DCFS observed her younger brother, M.S. (age three at the time, currently age six), noting he was extremely dirty, did not have any shoes, and had not been bathed for several days. T.S. was hospitalized under an emergency commitment due to his erratic behavior and obvious drug abuse. The children's mother, A.M., refused to provide her location or address.

During a hearing on February 15, 2022, the children were adjudicated Children in Need of Care ("CINC").[2] At the hearing, T.S. submitted to a drug screen and tested positive for amphetamine, methamphetamine, and benzodiazepines. At the hearing, T.S testified and claimed that he was working his case plan, had enrolled in a substance abuse program, and was taking parenting classes and anger management classes. T.S. also testified that he was prescribed Xanax and Adderall. T.S. did not appeal the judgment which resulted from the hearing, finding the children were in need of care. K.S. and M.S. have consistently remained in foster care for over the two years since the judicial determination they were in need of care and the date of the current appeal before this Court.

---

[2] La. Ch. C. art. 606 provides that a child who is the victim of abuse, neglect, or is without necessary food, clothing, or shelter constitutes grounds for finding that a child is in need of care.

At the beginning of the case plan, T.S. was allowed visitation with the children. By the time of the case review hearing on April 19, 2022, DCFS had suspended his visitation for various reasons. The foster parents with whom the children had been placed reported that M.S. (three years old at the time) threatened to kill himself with his father's gun and use his father's knife to harm the foster parents. S.S. reported to her foster parents that during the visit, T.S. encouraged M.S. to make threats against the foster parents. It was asserted at the review hearing that T.S. and the children's mother, A.M., continued to attempt to work their case plans. DCFS acknowledged that T.S. was testing negative for alcohol. T.S. attended visits with his children on June 23, 2022, and July 2, 2022.

The children have resided with Ambrose and Joy Smith for most of their stay in foster care, since March of 2022. The family resided in Bossier City, but later moved to Haynesville, Louisiana at some point during the children's stay. By the case review hearing on July 12, 2022, both children had completed individual counseling with the Center for Children and Families, who recommended additional counseling with the Office of Behavioral Health. Due to M.S. being under the age of 6 and Medicaid coverage issues, DCFS had difficulty finding counselors that could treat him. S.S. was also treating at that time with a psychiatrist for anxiety and depression.

At the next case review hearing on October 18, 2022, DCFS testified that the children's behavior became noticeably worse after visits with T.S. DCFS requested that visitation only occur during family counseling sessions. Rebecca Singletary (hereinafter "Caseworker Singletary"), the DCFS case worker, testified that except for family counseling sessions, T.S.

3

had completed his case plans. However, Caseworker Singletary testified that T.S. remarkably did not accept any personal responsibility for the children coming into foster care.

The first scheduled permanency hearing took place on December 13, 2022, at which Caseworker Singletary testified that the family had attended three family counseling sessions in Shreveport. The counselor who conducted the family counseling sessions ultimately withdrew from the case, but prior to withdrawing, she reported to DCFS that M.S. had disclosed alleged sexual abuse by his father, T.S. M.S. also made a disclosure that his father put his mouth on his penis "to remove spiders from it." Therefore, considering M.S.'s allegations against T.S., the counselor could not agree to counsel the family together.

DCFS made two additional referrals for trauma counseling for the children. M.S.'s behaviors that necessitated additional trauma counseling involved acting out sexually; M.S. consistently groped himself and spoke about "naked parties" at T.S.'s house. M.S. also exhibited violent behavior, including threatening to slit throats with T.S.'s knife, threatening to burn a house down, threatening to shoot people with T.S.'s gun, and threatening to throw people off bridges. M.S. experienced severe night terrors both at home and at school after naptime. Meanwhile, S.S. was suspended from school the day after a visit with T.S. in October 2022. Singletary noted that S.S. expressed frustration that T.S. viewed M.S. as his favorite, ignored her, and was argumentative with her. S.S. told DCFS employees that she did not want to have visits with T.S. because she was scared of her father. S.S. also cried to her foster parents about visits because T.S. ignored her during visits.

4

As a result of the issues surrounding visitation with T.S., DCFS requested he have no contact with the children. The trial court accepted DCFS's recommendation of no visitation due to the alleged sexual abuse allegations by M.S. and S.S.'s emotional reactions to visits with her father. At the conclusion of the December 13, 2022 permanency hearing, the trial court did not accept DCFS's recommended case plan goal of reunification/adoption and changed the case plan goal to adoption. The trial court specifically noted T.S.'s anger issues, allegations of sexual abuse, and S.S.'s fear of her father.

At a case review hearing on June 13, 2023, Caseworker Singletary testified that despite several denials from different providers, DCFS continued to pursue trauma therapy for the children but had not been able to secure any for M.S. due to his young age and Medicaid coverage issues. Caseworker Singletary testified that T.S. had technically completed his case plan and a mental health assessment that did not find any mental health concerns. However, Singletary testified that T.S. continued to not accept responsibility for his children being in foster care. She further testified that T.S. does not believe that the children had any trauma; he attributed his children's behaviors and issues to the foster parents. Singletary testified that when S.S. attempted to speak to T.S. during family visits, he turned away from her, and she left their visits extremely upset. Caseworker Singletary also testified that after the final family visit in August 2022, M.S.'s school counselor notified her that M.S. reported that T.S. had taken him into the restroom and told him to take a knife and slit the foster parents' throats. Caseworker Singletary testified that during one family counseling session, T.S. questioned M.S. about the sexual abuse allegations (after being asked

5

not to discuss the issue) and blamed S.S. for infrequent visits. Caseworker Singletary testified that at that time, S.S. expressed fear of T.S., that she did not want to visit him, and did not want to be returned to him.

CASA[3] volunteer, Cynthia Riser ("Riser"), testified that S.S. reported to her that she is terrified of returning to T.S. S.S. reports that T.S. only cares about M.S. and completely ignored her during visits. Riser testified that S.S. reported T.S. physically abused her in the past, and she is afraid it will happen again if she returns to his home. T.S. testified, denying any abuse of his children, and denied ever even spanking S.S. T.S. also testified that he was not aware that S.S. was terrified of him.

At the next scheduled case review hearing on October 10, 2023, Caseworker Singletary stated that M.S. had begun trauma therapy, was diagnosed with ADHD and PTSD, and started taking medication. Caseworker Singletary testified M.S. had improved since his recent diagnoses, and she attributed his improvements to his new medication and ability to focus. S.S. was also receiving treatment from a psychiatrist and was on medication for anxiety and depression. Caseworker Singletary testified that S.S. made a request for a female counselor, and that she continued to express a desire not to return to T.S.

At the November 14, 2023 case review hearing, DCFS testified there was no visitation with the children's mother, A.M., because she was not working her case plan, refused all drug screens, and did not maintain a permanent residence. At this point, family visitation had not taken place in

---

[3] CASA is a Court Appointed Special Advocate. A CASA is not an attorney but a lay advocate who volunteers his or her time to get to know the children in abuse and neglect cases and advocate for their best interests.

the 15 months since August of 2022. Caseworker Singletary testified that M.S. still exhibited inappropriate sexual behaviors, including touching his privates, talking about naked parties, and wanting to witness his younger foster sister's diaper changes. M.S. also made violent statements, including that he was going to cut his foster father's head off and throw it in the river. Caseworker Singletary acknowledged that T.S. did have housing and employment,[4] had completed substance abuse and mental health assessments, and had attended parenting and anger management classes.

Caseworker Singletary testified regarding DCFS's "Standard Decision-Making" Tool ("SDM") used to determine threats and potential of parents to abuse their children again. T.S. was classified as "high" and A.M. was classified as "very high." The SDM factors considered by DCFS included: agency history, new reports since children have been in foster care; no visitation, suspended visitation, or poor visitation; incomplete case plan; a parent who has completed a case plan but resides with someone who has not completed a case plan. Caseworker Singletary noted that a "high" classification at this stage of foster care (which began in December of 2021) indicated that T.S.'s protective capacity as a parent was diminished. Caseworker Singletary also noted T.S.'s long criminal history in both Sabine and DeSoto Parishes. The record shows that T.S.'s criminal history contains multiple arrests for crimes of violent and explosive behavior, including second degree battery, aggravated assault, aggravated battery, and multiple domestic abuse batteries, among other crimes.

---

[4] The record shows that T.S. had a CDL license, purchased his own truck, and was self-employed at the time of these proceedings.

The children's foster father, Ambrose Smith, testified that M.S. had daily anger issues and spent time in "time out" two to five times per day. Smith also testified that M.S. referred to his "bad dad" and exhibited worse behavior if M.S. believed he would see his father during a family counseling session. Foster mother, Joy Smith, testified that M.S. had night terrors, where he awoke in the night and spoke about his "DaDa" killing someone with a gun. M.S. also threatened to shoot Ambrose and Joy with his "DaDa's big gun." Joy testified that M.S. had inappropriately touched other children at church camp. As to S.S., Joy testified that S.S. expressed she did not want to live with her father again. S.S. reported to Joy that T.S. hit her with a belt, and she intended to run away if she had to live with her father again.

The children's mother, A.M., appeared at the November 14, 2023 case review hearing. A.M. testified that T.S. did not have any relationship with S.S. at all until S.S. entered the State's custody for the first time in Sabine Parish in 2017. T.S. was able to obtain custody of S.S., and he immediately allowed S.S. to go back to live with her mother. A.M. then moved to Arkansas with S.S. A.M. stated that S.S. had been with her most of her life and only knew her mother until she was around 6 years old. A.M. testified that T.S. developed a bond with M.S. from birth and clearly favored him over S.S. A.M. testified that T.S. made negative comments about S.S.'s weight. At the conclusion of the hearing, the trial court denied T.S.'s request for visitation with the children.

A second permanency hearing was held on December 12, 2023. Caseworker Singletary testified that T.S. was scheduled to meet with Dr. Simoneaux on February 14, 2024, pursuant to a court order for a

psychological examination.  The goal of adoption was still in place, and DCFS did not have recommendations for changing the goal of the case plan. Caseworker Singletary testified that T.S. had attended an examination with Dr. Sentell and explained that DCFS could not follow Dr. Sentell's findings because he did not have access to the complete DCFS case file which would allow him to make an informed decision regarding T.S.'s case plan.  Dr. Sentell's report recommended provided that "custody recommendations cannot be made without access to all participants, but short of a severe chemical dependency relapse, [T.S.] should be able to function consistently as he has in recent years."  Dr. Sentell stated that there was not sufficient evidence that T.S. would sexually abuse his children and found that T.S. "should not have a problem being an adequate parent."  Caseworker Singletary testified that DCFS was not aware of T.S.'s examination with Dr. Sentell until his report was submitted to the court.[5]

On February 14, 2024, T.S. attended a court-ordered psychological evaluation with Dr. John C. Simoneaux, Ph.D.  Dr. Simoneaux prepared a report which addressed questions posed by DCFS in order "to have a better understanding of [T.S's] strengths, abilities, deficiencies, and/or concerns in regard to his CINC case."  Dr. Simoneaux acknowledged that DCFS had worked closely with T.S., the children, and the foster parents in a genuine effort to protect the children from any further abuse and return the children to parental care if indicated, but noted in his report:

- DCFS acknowledged that T.S. had completed his case plan and noted more recent improvements in his interactions with DCFS but that T.S.

---

[5] An objection was made to the admission of Dr. Sentell's report, which was sustained by the trial court.  The report was proffered by counsel for T.S.

had difficulties during parenting classes, including T.S.'s hostility toward providers.

- T.S.'s anger management case was closed with the first service provider due to his behavior, though he later completed the classes through a different program.

- T.S. consistently underreported certain responses in his evaluation and tried to present himself in a very positive light.

- There were inconsistencies throughout T.S.'s examination, including responses regarding his criminal history, which were verifiably false.

- T.S. engaged in a degree of social avoidance and reported a lack of positive emotional experiences. These results were concerning in light of T.S.'s history, because if the children were returned to him, DCFS would need to monitor him to assess the children's well-being. T.S. demonstrated a tendency to avoid others and would almost certainly isolate himself.

- T.S. demonstrated a depressive irritability and a very negative way of relating to others, which surfaces by him displaying oppositional behavior, which presented repeatedly throughout DCFS case plan reports.

Dr. Simoneaux stated that based on his evaluation and T.S.'s history and his review of the entire case file, he believed that DCFS and the trial court's concerns were well-placed. Dr. Simoneaux emphasized T.S.'s refusal to acknowledge his role in the children's current situation, his lack of cooperation with DCFS in working the case plan, and his history of being threatening, impulsive, and dangerous not only to his children but also to others. Dr. Simoneaux stated that while T.S. may have met the formal

10

outlines of the case plan, he believed there would need to be additional provisions to the case plan. Specifically, T.S. would require extensive therapy for months, not weeks, with an extremely skilled therapist. Further, if visitation were restored, or the children were returned to his care, his case plan would require regular and routine oversight of his time with the children.

A case review hearing was then conducted on April 9, 2024. Jennifer Fields ("Fields") from DCFS testified that Dr. Simoneaux recommended one-on-one mental health counseling for T.S. as part of his ongoing case plan. Fields explained that DCFS was in the process of finding an appropriate counselor for T.S, pursuant to Dr. Simoneaux's recommendations. Fields testified that M.S. was still placed with Joy and Ambrose Smith, but S.S. had been moved to a therapeutic foster home since March 2024. Fields testified that since January 2024, S.S. was hospitalized three times at Cypress Grove Hospital for suicidal ideations, and she had been running away from the foster home. Fields testified that DCFS did not believe visitation was in the best interest of S.S., nor did Dr. Simoneaux. Fields recommended the case plan goal remain adoption, which the trial court accepted, and ordered that T.S. comply with the conditions set forth in Dr. Simoneaux's report.

The trial court signed a case review judgment following the case review hearing on April 9, 2024. The judgment provided that the children continue to be adjudicated CINC, and the permanent plan of adoption remain in effect. The court's ruling also included the case plan's specification that DCFS believed it to be in the best interest of the children

11

to have no visitation with T.S.  It is from this judgment, with a permanent plan for adoption of the children, that T.S. appeals.

## DISCUSSION

T.S. asserts two assignments of error, arguing that the trial court erred by establishing a case plan goal of adoption and suspending visitation with his children.

**Assignment of Error Number 1: The trial court erred when it continues to approve a case plan of adoption when T.S. has completed the case plan requirements.**

T.S. asserts that he has completed the case plan requirements; therefore, the case plan goal should not be adoption.  T.S. argues that he has completed the case plan by completing parenting and anger management classes, a substance abuse assessment, a mental health assessment, and maintains that he is not abusing any illegal substances.

We note at the outset that the health, safety, and best interest of the child is the paramount concern in all CINC proceedings.  La. Ch. C. art. 601. A CINC proceeding is commenced by a petition filed by the district attorney.  When authorized by the court, the DCFS may file a petition if there are reasonable grounds to believe that the child is a CINC.  La. Ch. C. art. 631; *State in Int. of Z.P.*, 52,354 (La. App. 2 Cir. 9/26/18), 255 So. 3d 727.

Within 60 days after a child enters the custody of a child care agency, the custodian shall develop a case plan detailing the custodian's efforts toward achieving a permanent placement for the child.  La. Ch. C. art. 673. The case plan shall be designed to achieve the least restrictive, most family-like, and most appropriate setting available, and in close proximity to the

12

parents' homes, consistent with the best interest and special needs of the child. The health and safety of the child shall be the paramount concern in the development of the case plan. La. Ch. C. art. 675.

If, at any point in CINC proceedings, the child is removed from his parents' care and control and placed in the custody of the DCFS, the case review process of La. Ch. C. arts. 687-700 is implemented. The custodial agency shall file a case review report with the court or, if appropriate, with the administrative review body ten days prior to every scheduled review hearing. La. Ch. C. art. 688. A review hearing shall be conducted by the court or administrative review body three months after the disposition hearing if the child was removed prior to disposition or within six months after the disposition hearing if the child was removed at disposition, but in no case more than six months after removal of the child from his parent(s). Case reviews shall continue to be held at least once every six months thereafter until the child is permanently placed, or earlier upon the motion of a party for good cause shown or on the court's own motion. La. Ch. C. art. 692.

Regarding permanency hearings, La. Ch. C. art. 702 provides, in pertinent part:

> B. The court shall conduct a permanency hearing within nine months after the disposition hearing if the child was removed prior to disposition or within twelve months if the child was removed at disposition, but in no case more than twelve months after the removal. Permanency reviews shall continue to be held at least once every twelve months thereafter until the child is permanently placed or earlier upon motion of a party for good cause shown or on the court's own motion.
>
> C. The court shall determine the permanent plan for the child that is most appropriate and in the best interest of the child in accordance with the following priorities of placement:

(1) Return the child to the legal custody of the parents within a specified time period consistent with the child's age and need for a safe and permanent home. In order for reunification to remain as the permanent plan for the child, the parent must be complying with the case plan and making significant measurable progress toward achieving its goals and correcting the conditions requiring the child to be in care.

(2) Adoption.
....

E. Except as otherwise provided in Article 672.1, the court shall determine whether the department has made reasonable efforts to reunify the parent and child or to finalize the child's placement in an alternative safe and permanent home in accordance with the child's permanent plan. The child's health and safety will be the paramount concern in the court's determination of the permanent plan.
....
G. When reunification is determined to be the permanent plan for the child, the court shall advise the parents that it is their obligation to achieve the case plan goals and correct the conditions that require the child to be in care within the time period specified by the court. Otherwise, an alternative permanent plan for the child will be selected and a petition to terminate parental rights may be filed. When adoption is the permanent plan for the child, the court will advise the parent of his authority to voluntarily surrender the child and to consent to the adoption prior to the filing of a petition to terminate parental rights.

More than simply protecting parental rights, our judicial system is required to protect the children's rights to thrive and survive. *State in the Int. of Z.P., supra*; *State in Int. of S.M.*, 98-0922 (La. 10/20/98), 719 So. 2d 445. A child has an interest in the termination of rights that prevent adoption and inhibit that child's establishment of secure, stable, long term, continuous family relationships. *State in the Int. of Z.P., supra*; *State in Int. of P.B.*, 49,668 (La. App. 2 Cir. 12/17/14), 154 So. 3d 806. Children need permanency and stability, and forcing them to remain in foster care indefinitely, when there is no hope of reunification, runs afoul of state and federal mandates to further the best interests of the child. *State in Int. of*

*J.M.L.*, 47,201 (La. App. 2 Cir. 4/11/12), 92 So. 3d 447.  While the interest of a parent is protected in a termination proceeding by enforcing the procedural rules enacted to ensure that parental rights are not thoughtlessly severed, those interests must ultimately yield to the paramount best interest of the children.  *State in Int. of C.S.*, 49,955 (La. App. 2 Cir. 3/18/15), 163 So. 3d 193.

For reunification to remain the permanent plan for the child, the parent must be complying with the case plan and making significant measurable progress toward achieving its goals and correcting the conditions requiring the child to be in care.  La. Ch. C. art. 702(C)(1).

In the context of both termination of parental rights and evaluation of permanency plans, the courts have used a reformation test to determine if a plan of reunification is consistent with the best interest and special needs of a child.  This test evaluates whether there is an expectation of reformation of a parent's conduct.  Conduct such as behavioral or mental disorders which cause a parent to refuse to cooperate with the authorities in addressing the needs of the child would also suggest that no reasonable expectation of reformation exists and that it is unlikely that the parent will reform.  However, a reasonable expectation of reformation is found to exist if the parent has cooperated with the state officials and has shown improvement, although not all of the problems that exist have been eliminated.  *State in Int. of Z.P., supra; State in Int. of P.B.*, *supra*.

Mere cooperation by a parent is not the sole focus of the evaluation of a permanency plan.  Rather, the courts must assess whether the parent has exhibited significant improvement in the particulars that caused the state to remove the children from the parent's care and custody.  Stability in the

home environment and relationships is a consideration in the permanency plan determination. A parent who professes an intention to exercise his or her parental rights and responsibilities must take some action in furtherance of the intention to avoid having those rights terminated. *State in Int. of Z.P., supra; State in Int. of P.B., supra.*

One factor considered in the termination of parental rights is if there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home. La. Ch. C. art. 1015(5); *State ex rel. H.A.S.*, 10-1529 (La. 11/30/10), 52 So. 3d 852. This element may be shown by one or more of the following, set forth in La. Ch. C. art. 1036(D):

> D. Under Article 1015(6), lack of any reasonable expectation of significant improvement in the parent's conduct in the near future may be evidenced by one or more of the following:
>
> (1) Any physical or mental illness, mental deficiency, substance abuse, or chemical dependency that renders the parent unable or incapable of exercising parental responsibilities without exposing the child to a substantial risk of serious harm, based upon expert opinion or based upon an established pattern of behavior.
>
> .....
>
> (3) Any other condition or conduct that reasonably indicates that the parent is unable or unwilling to provide an adequate permanent home for the child, based upon expert opinion or based upon an established pattern of behavior.

In some cases, the deficiencies of a parent in intellect and functioning make it unlikely that he or she will ever have the judgment necessary to parent children. *State in Int. of Z.P., supra; State in Int. of T.P.*, 51,172 (La. App. 2 Cir. 11/16/16), 209 So. 3d 1015. The impairment must expose the child to a substantial risk of harm, and that risk must be substantiated by expert testimony or by a pattern of risk to the child from the parent's acts or

16

omissions. *State in Int. of J.H.*, 51,100 (La. App. 2 Cir. 11/16/16), 209 So. 3d 1001.

To reverse a trial court's permanency plan determination, an appellate court must find from the record that the trial court's finding is clearly wrong or manifestly erroneous. *State in Int. of C.S.*, *supra*. In a manifest error review, it is important that the appellate court not substitute its own opinion when it is the juvenile court that is in the unique position to see and hear the witnesses as they testify. *State in Int. of N.C.*, 50,446 (La. App. 2 Cir. 11/18/15), 184 So. 3d 760; *State in Int. of P.F.*, 50,931 (La. App. 2 Cir. 6/22/16), 197 So. 3d 745.

Where there is conflicting testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even when the appellate court may feel that its own evaluations and inferences are as reasonable as those of the juvenile court. If the juvenile court's findings are reasonable considering the record reviewed in its entirety, the appellate court may not reverse, even though convinced that, had it been sitting as the trier of fact, it would have weighed the evidence differently. *State in Int. of P.F.*, *supra*; *State in Int. of E.M.*, 51,511 (La. App. 2 Cir. 6/2/17), 224 So. 3d 1122.

In the present matter, the trial court has had the advantage of observations and recommendations from experts and individuals with years of experience. Further, the trial court has observed the parties and heard from professionals involved with CINC matters during the numerous hearings and case reviews which have occurred for over two years as the matter has been pending. We find that the trial court did not err in ruling that the permanent case plan goal should remain adoption. The record

17

shows that T.S. possessed longstanding violent tendencies, and his behavior directly correlated to the behaviors and trauma his children exhibited in foster care. Although T.S. completed parenting and anger management classes, the record shows that he was noncompliant and disruptive with instructors and had to be referred for additional anger management classes due to his disruptive and oppositional behavior.

At the case review hearing on April 9, 2024, the trial court considered the expert evaluation by Dr. John Simoneaux, which detailed significant concerns regarding T.S. and his lack of progress. Dr. Simoneaux expressed concerns about T.S.'s insincere participation in most portions of his case plan. Dr. Simoneaux noted T.S.'s very violent tendencies, aberrant ideas, and extremely paranoid thoughts. He noted that any improvement T.S. makes is not consistent enough to provide comfort to his children. Dr. Simoneaux found that T.S. could not provide a stable, supportive, and predictable family life at this time, and his history would likely impact the development of the children. Such a conclusion is a significant factor for the trial court to weigh in reaching its ruling.

T.S. has had a clearly negative impact on M.S., consisting of encouraging violent behaviors, acting out sexually, and night terrors and anxiety. M.S. has also alleged sexual abuse by T.S. S.S. has endured T.S.'s favoritism for his son, M.S. The record established that T.S. consistently ignored S.S. at the visits he had with her. S.S. and her mother, A.M., reported that on numerous occasions, T.S. physically and emotionally abused her. The record shows that though T.S.'s home was cleaned while working the case plan, S.S.'s bedroom remained "filthy and untouched." We echo Dr. Simoneaux's conclusion that leaving one room in the house,

18

particularly the room for S.S., whom he had been accused of repeatedly ignoring, suggested that T.S.'s judgment with regard to parenting his children is tenuous at best. T.S.'s anger and poor judgment directed toward DCFS indicate serious issues, and unwillingness to work with the foster parents to support his children and spend supervised, controlled time with them is indicative of his consistent inability to provide a safe and stable environment for his children. Accordingly, a permanent case plan goal of adoption is appropriate in this case, and we find this assignment of error is without merit.

**Assignment of Error Number 2: The trial court erred when it continues to approve the suspension of visitation between T.S. and the children.**

T.S. asserts there is no evidence in the record from any treatment provider that states the children's visitation should be suspended. Additionally, on appeal, the minor children assert that the trial court erred in continuing to suspend visitation with T.S. Both children have expressed a desire to visit T.S and request that visitation gradually be restored, in accordance with their best interest.

It is well settled that a parent has a constitutionally protected liberty interest in establishing and maintaining a meaningful relationship with his or her children. *State in Int. of A.C.*, 93-1125 (La. 1/27/94), 643 So. 2d 719, *cert. denied*, 515 U.S. 1128, 115 S. Ct. 2291, 132 L. Ed. 2d 292 (1995); *State in Int. of MTS*, 49,630 (La. App. 2 Cir. 1/14/15), 161 So. 3d 1025; *State in Int. of ASW*, 49,310 (La. App. 2 Cir. 6/25/14), 144 So. 3d 1193. This parental interest includes the companionship, care, custody, and management of his or her children. *Lassiter v. Dept. of Social Svcs.*, 452 U.S. 18, 101 S. Ct. 2153, 68 L. Ed. 2d 640 (1981); *State in Int. of MTS*,

*supra*; *State in Int. of J.M.L.*, 47,201 (La. App. 2 Cir. 4/11/12), 92 So. 3d 447.

The best interest of the child is the sole criterion for determining a noncustodial parent's right to visitation. *Lucky v. Way*, 51,706 (La. App. 2 Cir. 9/1/17), 245 So. 3d 110, 129, *writ denied*, 17-1657 (La. 10/27/17), 228 So. 3d 1233; *Cooper v. Cooper*, 43,244 (La. App. 2 Cir. 3/12/08), 978 So. 2d 1156. The trial court has the inherent power to determine a child's best interest and to tailor custody orders, including visitation, in a manner that minimizes risk of harm to the child. *State in Int. of A.A.*, 52,388 (La. App. 2 Cir. 11/14/18), 261 So. 3d 124, 138, *writ denied,* 18-2060 (La. 1/28/19), 263 So. 3d 429, and *writ not considered,* 18-2060 (La. 4/8/19), 267 So. 3d 617.

On the well-documented record before us of serious concerns and multiple instances of a negative impact on the children arising from visitation, we find the trial court was not manifestly erroneous for maintaining the suspension of visitation with the children. Dr. Simoneaux's evaluation noted that T.S. has attitudes that reflect violent tendencies toward the children as well as people outside of his life. Dr. Simoneaux's report also indicates that T.S. consistently refuses to acknowledge or admit his abuse and neglect of his children, which led to them being taken from his home. Dr. Simoneaux opined that if the children have experienced trauma at the hands of T.S., any contact with T.S. must be handled carefully by a skilled therapist. While the interest of the parent must be balanced against the child's interest, the child's interest is paramount.

We acknowledge the understandable desire that S.S. and M.S. expressed to see their father, but their desires must be balanced against what is in their best interest from an adult's perspective and understanding of all

20

circumstances which may not be readily apparent to children of such tender ages. S.S. expressed numerous times throughout the case plan that she does not wish to live with T.S. T.S.'s influence on M.S. includes encouraging violent behavior, alleged sexual abuse, and inducing night terrors and anxiety. The trial court did not err in determining that contact with T.S. at this time is not in the best interest of the children. We likewise find this assignment of error is without merit.

## CONCLUSION

For the reasons stated above, we affirm the trial court's decision maintaining the permanent case plan goal of adoption and ordering that visitation remain suspended. Costs of this appeal are assessed to T.S.

**AFFIRMED.**